**Joseph A. & Dorothy D. MOLLER**

v.

**The UNITED STATES.**

**No. 208–81T.**

United States Claims Court.

Nov. 19, 1982.

As Amended Dec. 13, 1982.

David R. Frazer, Phoenix, Ariz., attorney of record, for plaintiffs. Yale F. Goldberg and Lewis & Roca, Phoenix, Ariz., of counsel.

David C. Hickman, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Donald H. Olson and Theodore D. Peyser, Washington, D.C., of counsel.

## OPINION

WHITE, Judge.

This case is related to the considerable number of cases in which courts, through the years, have dealt with the problem of whether taxpayers, in determining their income tax liabilities, may properly deduct from gross income expenses incurred by the taxpayers in connection with the management of their investments.

A common question in such cases is whether the activities of a taxpayer with respect to his investments constitute the

carrying on of a "trade or business," as the pertinent provision of the Internal Revenue Code (now contained in 26 U.S.C. § 162(a)) states in part that " * * * [t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." In this case, because of its unusual facts, the question just stated must be answered in the affirmative.

In the present case, Joseph A. and Dorothy D. Moller (plaintiffs) are husband and wife, and they are residents of Scottsdale, Arizona. During 1976 and 1977, the plaintiffs actively managed four separate portfolios of stocks and other securities, and, in doing so, they incurred expenses totaling $22,659.91 in 1976 and $29,561.69 in 1977.

The 1976 expenses included $5,832.88 as the cost of maintaining an office in the plaintiffs' principal residence at Scottsdale and $1,606.77 as the cost of maintaining a second office in the plaintiffs' summertime residence at Santa Barbara, California. The 1977 expenses included $5,350.55 as the cost of maintaining the office in Scottsdale and $1,896.66 as the cost of maintaining the office in Santa Barbara.

In preparing and filing their joint income tax returns for 1976 and 1977, the plaintiffs deducted from gross income the respective amounts which they had expended during 1976 and 1977 in connection with the management of the four portfolios.

On audit, the Internal Revenue Service (IRS) disallowed the portions of the plaintiffs' deductions based on the costs involved in maintaining the Scottsdale and Santa Barbara offices; and the IRS assessed deficiencies in income taxes, plus interest thereon, for 1976 and 1977.

The plaintiffs paid the deficiencies and interest, sought refunds from the IRS, and, having failed to secure administrative relief, filed the present action.

The Government has conceded that the office expenses with which the court is concerned in the present case were "ordinary and necessary expenses," but the Government disputes the plaintiffs' contention that they were carrying on a "trade or business" during the years in question.

The answer to the question of whether a taxpayer was carrying on a "trade or business" during a taxable period must be determined on the facts of the particular case. *Higgins v. Commissioner,* 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941); *Chang Hsiao Liang v. Commissioner,* 23 T.C. 1040, 1045 (1957). Consequently, in resolving the issue that is before the court in the present action, it is necessary to set out in considerable detail the facts concerning the plaintiffs' investment activities.

It has been mentioned earlier in the opinion that, during 1976 and 1977, the plaintiffs were actively engaged in the management of four portfolios of stocks and other securities. The same four portfolios were managed by the plaintiffs before 1976, and the plaintiffs have continued to manage them since 1977. One of these portfolios consists of securities held by the plaintiff Joseph A. Moller (Mr. Moller) individually, a second consists of securities held by the plaintiff Dorothy D. Moller (Mrs. Moller) individually, a third consists of securities held by Northern Trust No. 1–29551 (Northern Trust), and the fourth consists of securities held by the First Interstate Bank Trust No. 50–50–0224 (First Interstate Trust).

In 1976, the total value of all four portfolios was approximately $13,500,000. In 1977, the total value of the four portfolios was approximately $14,500,000.

The First Northern Trust originated through stock put in trust for Mrs. Moller by her former husband. She is entitled to receive the income from this trust during her lifetime; and, upon her death, the corpus will pass to the other heirs of her former husband.

The First Interstate Trust originated through stock put in trust by Mr. Moller's first wife (now deceased). Mr. Moller receives the income from this trust during his lifetime; and, upon his death, the corpus will pass to the children of his first marriage.

The Northern Trust Company is the trustee of the Northern Trust. Mr. Moller is the trustee of the First Interstate Trust. However, Mr. and Mrs. Moller make all the investment decisions in regard to both of the trusts, as well as with respect to the two portfolios held by them individually.

During 1976 and 1977, the plaintiffs devoted their full time to their investment activities; and each regularly spent between 40 and 42 hours per week in conducting such activities. The plaintiffs kept regular office hours and, on a daily basis, monitored the stock market and their four portfolios. This included studying the performance of the securities held in the four portfolios, and also the performance of securities that were regarded as prospects for purchase and inclusion in the portfolios.

With respect to the stocks that were considered as candidates for purchase, the plaintiffs maintained the following records on a current basis:

(1) A watch list, listing all stocks on the New York Stock Exchange that were considered to be candidates for possible purchase. This list was updated at least once or twice per week.

(2) A book of product research notes, containing information concerning the product of the industry in which any company under study was engaged. These notes contained definitions and information concerning product uses, manner of use, and supply and sales market data for the product.

(3) A portfolio information book, containing information on stocks promoted from the watch list but not yet purchased. These were stocks which were more actively and closely followed than those on the watch list. They were highly eligible for purchase and, depending on the circumstances, would probably be purchased.

Before a decision was made by the plaintiffs to purchase a stock, it was generally watched by the plaintiffs for a period of between 2 to 6 months; and often a stock was watched as long as 1 year.

The monitoring and study of stocks held in the four portfolios included the assembly and maintenance of information regarding the corporations invested in, their products, and their performance. The following records on such stocks were maintained by the plaintiffs on a current basis:

(1) A stock note data book which contained an alphabetical list of the stocks held and included the earning percentage of each company's product in its market and the company's profit percentage in that market, as well as other information which would affect the value of the stock.

(2) A stock record book for each portfolio, listing all stocks currently held, in which entries were made whenever a stock was purchased.

(3) A current stock purchase book, containing a sheet for each stock, prepared on the date of purchase, recording the number of shares purchased, the date of purchase, and the cost. A master sheet was made up of these purchases, to indicate the stock-of-record dates so that the plaintiffs could determine whether dividends would be paid on the current purchases. The sheet made up for each stock was placed in the stock record book only when the stock certificate was received. On receipt of the stock certificate, the certificate number and the date were recorded on the stock purchase sheet and inserted in the stock record book.

(4) Current capital gains records, which provided a detailed record of gains and losses.

(5) Dividend record books, indicating the number of shares held in each stock, the dividend for each, and the total dividend, as well as the information from Forms 1099 at the end of each year to check those totals against the dividend record books' totals.

The plaintiffs kept the following records on a current basis both for stocks held and for stocks that were being considered for purchase:

(1) Stock purchase worksheets, which were projections for stocks based on study and the daily quotations. These sheets contained projections for possible use in examining options of purchasing one stock as opposed to another, the likely stocks to be

sold if cash were to be needed, and the relative desirability of various stocks. The stocks to be purchased were drawn from this list.

(2) Market information on all securities held in the portfolios and on some securities that were being watched for possible purchase, including certain securities which might have been held in the past and were regarded as candidates for repurchase. The weekly price for each stock as of the close of the market on Friday night was entered, as well as the type of stock, its rating, symbol, and range of prices, and an indication of the last purchase.

The plaintiffs made all of their investment decisions "on their own." They did not employ an investment advisor, and they did not seek investment advice from their stockbroker.

In order to assist them in their investment studies and decisions, the plaintiffs subscribed to and regularly studied a number of publications and services. Three of these (including the Wall Street Journal) were received on a daily basis, 10 were received on a weekly basis, three were received on a monthly basis, and five were received on a quarterly basis. In addition, the plaintiffs also received and studied the annual reports of companies in which they were interested. Mr. Moller studied these materials between 8 and 10 hours a week, and Mrs. Moller studied them between 7 and 8 hours per week. The cost of the publications and services to which the plaintiffs subscribed was approximately $1,800 in 1976 and $2,400 in 1977.

The plaintiffs engaged in 83 security purchase transactions in 1976 and in 76 such transactions in 1977. The total dollar amounts of these transactions were $1,844,669 in 1976 and $958,073 in 1977.[1]

The plaintiffs invested in Treasury Bills any funds which were not currently committed to stocks, in order to maintain the liquidity of those funds, while still producing revenue. The 1976 and 1977 transactions in Treasury Bills, including roll-overs of Treasury Bills that matured during those years, involved total dollar volumes of $2,561,739 in 1976 and $1,500,042 in 1977. The plaintiffs maintained a sheet on which the Treasury Bills were recorded, together with the amounts and the dates on which they would become due, and also a Treasury Bills transaction summary, indicating purchases, sales, and dates of sale and purchase, as well as the amounts involved.

In 1976, the plaintiffs engaged in 41 transactions involving sales of securities.[2] The total dollar amount of these transactions in 1976 was $1,679,813. In 1977, the plaintiffs engaged in 30 transactions involving sales of securities.[3] The dollar amount involved in the 1977 sale transactions was $821,028. The stocks sold in 1976 and 1977 had been held for an average of more than 3½ years and 8 years, respectively.

During 1976 and 1977, the portfolios included stocks that were neither purchased nor sold during those years, but were retained during the period. A decision to retain a stock was a continuing one, and involved a study (1) of the administration of the corporation, (2) of the corporation's outlook, plans, and spending levels for development, (3) of the acceptance of the corporation's product in the market place, i.e., whether such product was growing or lessening in importance, and (4) of the price-earning ratio of the stock. As the plaintiffs were attempting to minimize risk and maximize long-term growth, the decision to hold a stock was equally as important as a decision to buy or sell a stock.

---

1. Eight of the security purchase transactions in 1976 and nine in 1977 consisted of deposits to secure shares in interest-bearing common trust accounts at Northern Trust Company; three transactions in 1976 and 23 in 1977 consisted of invasions by Mrs. Moller of the corpus of the Great Northern Trust (she could invade the corpus annually to the extent of 5 percent); and 14 transactions in 1976 and nine in 1977 consisted of stocks acquired through splits and stock dividends.

2. This figure includes 22 withdrawals from common trust funds.

3. This figure includes seven withdrawals from common trust funds.

The plaintiffs maintained telephone contact with their broker at E.F. Hutton & Company every other day, on the average. On days of active trading, 10 or 15 calls per day could be placed to the broker, and, on less active days, one or two calls a day could be placed. The plaintiffs' account with E.F. Hutton & Company was the largest account of that firm's local office, being larger than the accounts which any of the local banks had with the firm.

Ever since 1965, the plaintiffs have relied almost wholly on their income from investments for their livelihood. Their only other sources of income have been two small pensions and social security.

The plaintiffs' income from dividends and interest (*i.e.*, from investments) has steadily increased through the years. In 1976, their income from dividends and interest amounted to $543,265, and their federal income tax amounted to $297,745. In 1977, the plaintiffs' income from dividends and interest amounted to $590,762, and their federal income tax amounted to $316,721.

The plaintiffs maintained five separate bank accounts in connection with their investment activities. One of these bank accounts was for the payment of expenses incurred in the conduct of such activities.

During the 1976–77 period (as well as before and after that period), the plaintiffs conducted their investment activities (except during the summertime) in a well-equipped office which they maintained in Scottsdale. They were assisted in such activities by a secretary/bookkeeper, who worked approximately 22 hours per week and whose work related almost wholly to the plaintiffs' investment activities. The office consisted of two rooms, and contained a desk for Mr. Moller, a desk for Mrs. Moller, a desk for the secretary/bookkeeper, calculating and reproduction machines, filing cabinets, a typewriter, a checkwriter, a postage meter, and a 2-drawer filing cabinet for current files. All of the books, records, documents, publications, and services previously described were stored in this office.

At all times pertinent to this case, the plaintiffs also maintained a similarly equipped office in Santa Barbara, California, except that their permanent files remained in Scottsdale. The plaintiffs spent (and they still spend) their summers in Santa Barbara. They performed the same sort of investment activities in their Santa Barbara office that they performed in their Scottsdale office.

The plaintiffs' Scottsdale and Santa Barbara offices were used exclusively for their investment activities. As stated earlier in the opinion, each of the plaintiffs devoted between 40 and 42 hours per week to such activities. (The plaintiffs' offices will be mentioned again at a later point in the opinion.)

The facts, as previously summarized, indicate that the plaintiffs would not qualify as traders in the securities market. A trading account has been defined as one in which "securities are bought and sold with reasonable frequency in an endeavor to catch the swings in the daily market movements and profit thereby on a short-term basis." *Chang Hsiao Liang v. Commissioner, supra,* 23 T.C. at 1043. The plaintiffs in this case were investors rather than traders, as they were primarily interested in long-term growth and the payment of dividends by the companies in which they invested.

In dealing with the deductibility of expenses incurred by investors in the management of their investments, the decided cases have tended to distinguish "between a passive investor and one whose activities place him in the category of those carrying on business * * *." *Kales v. Commissioner,* 101 F.2d 35, 38 (6th Cir.1939).

The facts clearly show that the plaintiffs were anything but "passive" investors. On the contrary, their investment activities were regular, extensive, and continuous, and they involved the active and constant exercise of managerial and decision-making functions.

The plaintiffs in this case have made a substantially better showing in support of their contention that they were carrying on a business during the period in question

**1076**

than did the taxpayer in the *Kales* case, previously cited. In that case, the taxpayer was a woman of considerable means who had inherited from her father valuable real estate and stocks in 46 corporations. She had an arrangement with a law firm whereby her books were kept by the firm's bookkeeping staff, and she paid $3,000 a year for this service. The firm set aside an office where the taxpayer could confer with the head bookkeeper, and she visited the office three or four times a week for this purpose. She made all the decisions effecting either the purchase or the sale of her securities. During a 14-year period, the taxpayer purchased bonds in the aggregate amount of more than $11,665,000, bonds were sold or matured in the aggregate amount of over $3,000,000, and stocks were purchased in the aggregate amount of approximately $500,-000.

In successfully suing to recover income taxes which she was required to pay pursuant to deficiency assessments, Mrs. Kales expended a considerable sum for attorney fees and other expenses. The Court of Appeals held that such expenses were deductible for income tax purposes, stating (101 F.2d at 39):

> Concluding that there are cases where the activities of taxpayers are such that though they invest but their own capital they are none the less carrying on a business, we think that Mrs. Kales' activities bring her deductions within the permissible scope of the statute. * * *

The court also said (*id.* at 39) in this connection that it was "sufficient to say that * * * [the taxpayer's activities] were extensive, varied, continuous and regular * * *."

The plaintiffs' offices were well-equipped and personally maintained by the plaintiffs, and not borrowed office space such as that used by Mrs. Kales; the plaintiffs kept regular office hours each working day and devoted from 40 to 42 hours per week to their investment activities, instead of merely visiting the office three or four times a week as Mrs. Kales did; the plaintiffs devoted their full time to their investment activities and each day carefully monitored the stock market and their four portfolios of stocks, which Mrs. Kales apparently did not do; the plaintiffs subscribed to and carefully studied numerous publications and services in order to keep abreast of developments in the stockmarket, which apparently Mrs. Kales did not do; and the plaintiffs kept elaborate, up-to-date records on the performance of the stocks in which they had invested, and also of stocks which they regarded as possible candidates for purchase, which Mrs. Kales apparently did not do. Accordingly, the plaintiffs' investment activities were certainly more "extensive, varied, continuous and regular" than were the investment activities of Mrs. Kales, who was allowed to deduct her investment expenses.

It must be noted that the Supreme Court once said that "investing is not a trade or business." *Whipple v. Commissioner,* 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963). This statement, however, should be considered in context. The *Whipple* case did not involve expenses incurred in the management of a portfolio of securities. The taxpayer in that case organized, owned the controlling interest in, and managed a bottling company (among other companies). He sold equipment on credit to the bottling company; the indebtedness became worthless; and he deducted it as a business bad debt in computing taxable income. In holding that the deduction was improper, the Court stated in part as follows (373 U.S. at 202, 83 S.Ct. at 1174):

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demon-

strating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

Consideration should also be given to the Supreme Court's decision in *Higgins v. Commissioner,* 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941). In that case, the taxpayer lived in Paris, France, but he had extensive investments (real estate and securities) in this country. To assist him in the management of his financial affairs, the taxpayer maintained an office in New York City, staffed by four employees, and an office in Paris, staffed by the taxpayer's secretary. The activities of the New York City office related principally to the taxpayer's real estate holdings, particularly the rental of buildings, but they also related to the taxpayer's securities. There was no controversy before the Court about the deductibility of the office expenses insofar as they were allocable to the management of the plaintiff's real estate. The controversy related to the portion of the office expenses allocable to the management of the taxpayer's securities.

Through correspondence, the taxpayer in the *Higgins* case kept a watchful eye over his securities. However, as his portfolio consisted mostly of permanent investments, there were only limited shiftings in his portfolio. The activities in connection with the securities were performed by the taxpayer's New York City office, which kept records, received the relatively few securities that were purchased pursuant to the taxpayer's instructions, received dividend and interest checks, made deposits, and forwarded weekly and annual reports to the taxpayer.

In holding that the taxpayer's office expenses in the *Higgins* case were not deductible for income tax purposes insofar as the expenses were allocable to the management of the taxpayer's securities, the Court stated in part as follows (312 U.S. at 218, 61 S.Ct. at 478):

* * * The Commissioner [of Internal Revenue] and the Board [of Tax Appeals] appraised the evidence here as insufficient to establish petitioner's activities as those of carrying on a business. The petitioner merely kept records and collected interest and dividends from his securities, through managerial attention for his investments. No matter how large the estate or how continuous or extended the work required may be, such facts are not sufficient as a matter of law to permit the courts to reverse the decision of the Board. * * *

The activities of the taxpayer and his employees in the *Higgins* case, insofar as the management of the taxpayer's securities was concerned (they "merely kept records and collected interest and dividends from his securities"), were not at all comparable to the regular, extensive, and continuous activities of the plaintiffs in this case with respect to the four portfolios of securities which they managed. Consequently, the facts of the *Higgins* case are readily distinguishable from the facts of the present case.

Other cases in which investors received unfavorable court decisions can also be distinguished from the present case. For example, in *Snyder v. Commissioner,* 295 U.S. 134, 55 S.Ct. 737, 79 L.Ed. 1351 (1935), the taxpayer did not devote a substantial part of his business day to his stock transactions. In *Deputy v. Du Pont,* 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940), the taxpayer's expenses were not "ordinary and necessary expenses." In *Wilson v. United States,* 179 Ct.Cl. 725, 376 F.2d 280 (1967), one taxpayer devoted an average of only 2 or 3 hours a day, and another taxpayer devoted an average of only 3 or 4 hours per week, to the management of their securities portfolio. In *Kane v. Commissoner,* 100 F.2d 382 (2d

Cir.1938), the evidence did not show to what extent there was activity in buying or selling securities. In *Miller v. Commissioner,* 102 F.2d 476 (9th Cir.1939), there was no evidence relating either to the number or to the extent of the taxpayer's dealings in securities. In *Purvis v. Commissioner,* 530 F.2d 1332 (9th Cir.1976), the taxpayer did not maintain a separate bank account, or office, or personnel in connection with his transactions in securities; his study of the stock market consisted of visiting brokers' offices three or four times a week to observe the market; and his income tax returns consistently indicated that his occupation was that of an attorney.

On the basis of the unusual facts in this case, it is concluded, and found as a fact, that the plaintiffs' office expenses were ordinary and necessary expenses incurred in carrying on a business.

As mentioned earlier in the opinion, the plaintiffs' expenses with which the court is concerned in this case were expenses incurred in connection with the maintenance of offices in the plaintiffs' residences at Scottsdale and Santa Barbara. Accordingly, it is necessary to refer to 26 U.S.C. § 280A, which provides in part as follows:

> (a) General rule.—Except as otherwise provided in this section, in the case of a taxpayer who is an individual * * *, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.

> \*   \*   \*   \*   \*   \*

> (c) Exceptions for certain business or rental use * * *.—

> (1) Certain business use.—Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis—

> (A) the principal place of business for any trade or business of the taxpayer.

It has already been determined that the plaintiffs were carrying on a business during the taxable period involved in this case.

The facts show that the offices in their Scottsdale and Santa Barbara homes were the plaintiffs' principal place of business, as virtually all of their investment activities were conducted in the respective offices, depending on the seasons of the year.

Also, the facts show that the two offices were used exclusively for business purposes. The plaintiffs did not entertain there, and guests did not go there. Other parts of the respective residences were used for such purposes.

In addition, the facts show that the offices were used regularly for business purposes. The plaintiffs kept regular office hours there each working day, and each devoted from 40 to 42 hours per week to their investment activities.

Accordingly, the plaintiffs' use of offices in their Scottsdale and Santa Barbara residences came within the exception previously quoted from 26 U.S.C. § 280A(c)(1)(A), and the expenses incurred in maintaining the offices are deductible for income tax purposes.

It necessarily follows that the plaintiffs are entitled to recover. The determination of the amount of the recovery will be determined in subsequent proceedings under Rule 42(c).

## CONCLUSION OF LAW

On the facts, as found by the court, the court concludes as a matter of law and decides that the plaintiffs are entitled to recover, together with interest computed in accordance with section 6611 of the Internal Revenue Code of 1954. The determination of the amount of the plaintiffs' recovery is reserved for further proceedings under Rule 42(c), after which a final judgment will be entered.