**CAMPBELL TAGGART, INC.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

No. 83–1528.

United States Court of Appeals,
Fifth Circuit.

Oct. 19, 1984.

---

Jay W. Miller, Glenn L. Archer, Asst. Atty. Gen., Michael L. Paup, Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Peter J. Turner, Neil J. O'Brien, Donald H. Mackaman, Dallas, Tex., for plaintiff-appellee.

Before GEE, POLITZ and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

The United States appeals from a judgment granting a corporate taxpayer a refund for federal income taxes paid in 1975. The issue presented is whether the taxpayer is entitled, under the *Corn Products* doctrine, to an ordinary deduction for losses sustained on the sale of stock in a foreign corporation. For the reasons set forth below, we agree that the taxpayer sustained an ordinary rather than a capital loss. We affirm. 552 F.Supp. 355.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### A. *Facts.*

Campbell Taggart, Inc. ("CTI") claimed an ordinary deduction on its 1975 federal income tax return for losses sustained on the sale of stock in a Spanish corporation known as Superdescuento Uno, Dos, Tres, S.A. ("Supermarkets"). The Commissioner of Internal Revenue ("Commissioner") disallowed the deduction in its entirety. CTI paid deficiencies assessed against it and, after exhausting its remedies before the Commissioner, brought this suit for refund in the district court.

The material facts surrounding CTI's purchase and sale of the Supermarkets stock are not disputed.[1] CTI is a Delaware corporation that operates as a holding and service company: its income derives principally from service fees paid and dividends declared by operating subsidiaries. Its subsidiaries are engaged in the manufacture, sale and storage of food products, primarily through bakeries and related facilities. CTI currently owns stock in approximately sixty-three domestic and foreign subsidiaries. Most of these subsidiaries have been acquired by CTI as going businesses. In fact, CTI's growth and expansion into new markets has historically been primarily through acquisitions.

Since a 1967 Federal Trade Commission order restricting CTI's further expansion in the domestic baking industry, CTI has been actively pursuing foreign acquisitions. In 1971, for example, CTI acquired a 50% interest in a Spanish bakery from Jaime Jorba ("Jorba"), a Mexican national. In late 1972, CTI commenced negotiations with Jorba concerning acquisition of a 50% interest in Supermarkets, which negotiations culminated in the transaction underlying the deduction involved in this appeal.

Supermarkets owns twelve grocery stores in Spain. In 1972, Jorba and certain of his Spanish relatives owned 100% of Supermarkets' stock. On December 6, 1972, CTI entered into a preliminary agreement (the "Preliminary Agreement") to purchase 50% of Supermarkets' stock from Jorba.[2] CTI agreed to pay Jorba 7,000,000 pesetas and to pay 80,000,000 pesetas to Supermarkets itself, as a contribution to capital. Under the Preliminary Agreement, the parties agreed, upon satisfaction of four conditions, to close the transaction by executing a more detailed agreement (the "Final Agreement") conveying the stock and governing the division of management powers between CTI and Jorba.

---

1. The parties filed a Joint Stipulation of Facts, Record Vol. 1 at 77, from which this summary of facts is drawn.

2. In a preliminary step, Jorba was to acquire the stock of his Spanish relatives. At the conclusion of the transaction, Jorba would own 50% of the Supermarkets stock and CTI would own the other 50%.

The Preliminary Agreement conditions the obligation to close the deal, by executing the Final Agreement, on the following: (1) approval of the transaction by the Spanish government; (2) an independent audit of Supermarkets by accountants hired by CTI; (3) "no material adverse change" in Supermarkets' financial condition between execution of the Preliminary Agreement and the Final Agreement; and (4) satisfaction of certain warranties and representations that Jorba made with respect to the condition of Supermarkets and his ownership thereof. Closing of the Final Agreement was scheduled to occur within thirty days of the Spanish government's approval of the transaction. Government approval was required because the stock purchase would result in 100% foreign ownership of Supermarkets' stock.

On October 10, 1973, the parties modified the Preliminary Agreement. Spanish lawyers advised that the petition for approval of foreign ownership would receive more favorable treatment if CTI acquired a small interest in Supermarkets and joined in the petition. Therefore, an agreement (the "October Modification") was signed on October 10, 1973, pursuant to which CTI purchased 25% of Supermarkets' stock from Jorba[3] for 7,000,000 pesetas. The October Modification contemplated that, upon receipt of government approval, the deal would close on the same basic terms outlined in the original documents.[4] For example, the October Modification contains the same four conditions found in the Preliminary Agreement. It also obligates Jorba to repurchase the stock at the original

sale price of 7,000,000 pesetas, if government approval is denied.[5]

Sometime after October of 1973, but before execution of the Final Agreement, CTI discovered that Supermarkets' financial condition had deteriorated. On the advice of counsel, CTI determined that, under the "no material adverse change" clause of the Preliminary Agreement and the October Modification, it was not obligated to purchase the Supermarkets' stock if and when government approval was received. By January of 1974, CTI had decided to sell its interest in Supermarkets. On January 18, 1974, Jorba agreed to join CTI in efforts to find a buyer for all of Supermarkets' stock. Thus, CTI and Jorba were actively seeking to dispose of Supermarkets even before the Final Agreement was executed.

Initial efforts to sell the Supermarkets stock proved unsuccessful. In the meantime, the Spanish government approved 100% foreign ownership of Supermarkets and, on November 20, 1974, the Final Agreement, as amended to reflect the October Modification, was executed. CTI acquired an additional 25% of Supermarkets' stock and contributed 80,000,000 pesetas to Supermarkets' capital account.

After closing the transaction, CTI and Jorba continued their efforts to dispose of the Supermarkets stock. They finally found a buyer late in 1975 and, on December 15, 1975, sold the stock at a substantial loss. CTI claimed a deduction on its 1974 tax return for legal and professional fees related to the acquisition and sale of the stock. On its 1975 return, CTI claimed a deduction for additional professional fees related to the Supermarkets deal and an

3. CTI purchased one-half of Jorba's 50% interest in Supermarkets. After this October sale, Supermarkets' stock was owned as follows: CTI—25%; Jorba—25%; and Jorba's Spanish relatives—50%.

4. Obviously, the Final Agreement was modified to reflect the October 1973 changes to the deal. For example, since CTI paid Jorba 7,000,000 pesetas in October, the Final Agreement called only for an 80,000,000 peseta contribution to capital.

5. The district court found that, because of this escape clause, the October Modification did not

alter the substance of the transaction. 552 F.Supp. at 357. At trial, the Government argued, in effect, that CTI held at least one-half of the Supermarkets' stock as a capital asset because CTI was still motivated by its original investment purpose in October of 1973 when it executed the October Modification. Record Vol. 2 at 266. The Government has apparently abandoned this argument on appeal, and we therefore decline to question the district court's decision to "look through" the October Modification. 552 F.Supp. at 357.

ordinary deduction for the loss suffered on the sale of the stock. The Commissioner disallowed these deductions and CTI paid assessed deficiencies and brought this suit for a tax refund.

### B. *Proceedings in the Court Below.*

At trial, CTI claimed alternatively that, with respect to the loss it sustained on the sale of Supermarkets stock,[6] it is entitled to (1) an ordinary loss deduction in 1975 under I.R.C. § 165(a)[7] or (2) an ordinary and necessary business deduction in 1974 under I.R.C. § 162(a).[8]

Although the parties stipulated to most of the material facts, CTI presented four witnesses at trial who testified primarily about CTI's reasons for purchasing the Supermarkets stock. CTI concedes that, when it executed the Preliminary Agreement, it intended to acquire the Supermarkets stock as a capital investment, pursuant to its traditional pattern of growth through acquisitions.[9] CTI maintains, however, that, in effect, it changed its corporate mind long before the deal actually closed in November of 1974: the stock was ultimately purchased for business reasons, not investment reasons. CTI offered evidence that its attorneys determined that CTI was not bound under the Preliminary Agreement or the October Modification to purchase the Supermarkets stock in No-

vember of 1974, but that it did so anyway to protect its goodwill and reputation.[10] CTI argued that, because it lacked an investment motive in November of 1974, the stock, which all agree is normally a capital asset, was an ordinary asset under the *Corn Products* doctrine.[11]

The Government argued at trial that CTI's original purpose in purchasing the Supermarkets stock, which was admittedly to acquire a capital asset, should control the nature of the stock in CTI's hands. Alternatively, the Government argued that, even assuming CTI purchased the stock on November 20, 1974 solely to protect its goodwill, CTI necessarily had an investment motive on that date because the goodwill that it thereby protected reflected on its ability to make future investments, not its ability to carry on ordinary business activities.

The district court held that CTI is entitled to an ordinary deduction in 1975, under I.R.C. § 165, for the loss sustained on the sale of the Supermarkets stock. The court applied the *Corn Products* doctrine on the following fact findings: (1) CTI was attempting to sell its interest in Supermarkets even before the Final Agreement was executed; (2) CTI was not legally obligated to purchase the Supermarkets stock; (3) CTI knew when it executed the Final

---

6. The parties have stipulated that the legal and professional fees will be treated in a manner consistent with the treatment given CTI's loss on the sale of the Supermarkets stock. Record Vol. 1 at 77.

7. Unless otherwise indicated, all references are to the Internal Revenue Code of 1954, as amended. I.R.C. § 165(a) provides:
   General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

8. I.R.C. § 162(a) provides, in pertinent part:
   In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
   (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

9. Joint Stipulation No. 18, Record Vol. 1 at 80.

10. CTI's President and Vice-President for international operations testified that, although CTI had a legal "out," they went through with the transaction to avoid being perceived as "deal breakers."

11. *See Corn Products Refining Co. v. Comm'r,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

Agreement that it was paying more than fair market value for the Supermarkets stock and that "Supermarkets' prospects were dim"; (4) CTI bought the stock to protect its "business reputation, goodwill and credibility as an acquirer of businesses"; (5) CTI's original investment motive "played no part in the consummation of the bargain"; and (6) CTI purchased the stock with "only the single motive of wanting to preserve its goodwill." 552 F.Supp. at 357–59.[12]

## II. CONTENTIONS ON APPEAL.

The Government appeals from the district court's judgment and contends that the *Corn Products* doctrine does not apply on these facts. CTI cross appeals, arguing that, if it is not entitled to an ordinary loss deduction in 1975 when it sold the stock, it is entitled to a business deduction in 1974 when it purchased the stock.

### A. *The Issues.*

The Government does not attack any of the fact findings below, but complains that the district court applied the wrong legal standard in determining that *Corn Products* controls this case. The Government

argues that the mere absence of an investment motive in acquiring what is normally a capital asset does not automatically make the asset an ordinary one. Rather, the Government maintains, *Corn Products* treats assets that are literally within the statutory definition of capital assets as ordinary assets when they are acquired without an investment motive *and* as a "necessary and integral" act in the conduct of taxpayer's business.[13] In fact, the argument continues, the purchase of Supermarkets stock could not be a necessary and integral act in carrying out CTI's business because (1) the stock was purchased to protect CTI's goodwill as an acquirer of corporate securities (and as the recipient of dividends generated thereby) and (2) as a matter of tax law, the acquisition of stock and the collection of dividends do not constitute a "business." The only "business" that CTI conducts, according to the Government, is the business of providing services to its operating subsidiaries. Since the acquisition of the Supermarkets stock, though not itself intended as an investment in the traditional sense, was primarily intended to benefit CTI's investment activities and not its business activities,[14]

12. The district court did not itself determine the reasonableness of CTI's decision to purchase the stock, though CTI was not bound to do so, because "the issues ... as framed by the parties appear to subsume the basic reasonableness of [CTI's] carrying out the transaction." 552 F.Supp. at 359. We do not, however, find the district court's failure independently to evaluate the reasonableness of the transaction material. *See* Part VI, *infra.* In any event, the Government does not contest the reasonableness of the transaction, as distinguished from the degree to which it was necessary and integral to CTI's business.

13. The district court did not determine whether CTI purchased the Supermarkets stock as a necessary and integral act in conducting its business. The Government reasons from this failure that the court applied an erroneous legal standard. We note, however, that the district court specifically addressed the necessity and reasonableness of the stock purchase and held that it need not decide the issue. *See* note 12, *supra.*

14. The Government maintains that the district court's finding (and the stipulation upon which it is based), that CTI went through with the

Supermarkets deal to protect its "business reputation, goodwill and credibility as an acquirer of businesses," means only that backing out of the deal would have injured CTI's reputation with respect to its acquisition activities, not its service business. Appellant's Reply Brief at 20. CTI, however, reads the court's opinion more broadly, to include the determination that avoiding the Supermarkets deal would also effect CTI's goodwill in the service end of its activities. Appellee's Brief at 17–19. We think the Government's position is somewhat contradictory: it argues, on the one hand, that the existence of a "business" is critical to the application of the *Corn Products* exception and, on the other hand, that its own stipulation that CTI's "business reputation" would suffer relates to CTI's reputation as an investor, *not* as a business entity. The Government apparently reads the stipulation's phrase "as an acquirer of businesses" to modify "credibility," "goodwill," *and* "business reputation." If we were to accept the Government's distinctions, however, it would not be possible to have a "business reputation" with respect to acquisition activities because an acquirer of companies is not engaged in a business. Because, however, we find that this stock purchase falls squarely within the

*Corn Products,* to the Government, cannot apply.

CTI responds that the application of *Corn Products* does not depend on a finding that an asset was acquired as a necessary and integral act in the conduct of its business. Rather, CTI maintains, the district court's uncontested finding of a noninvestment purpose in the acquisition of the Supermarkets stock is sufficient to trigger ordinary loss treatment.[15]

### B. *The Standard of Review.*

■ We are, of course, bound by the district court's findings of fact unless those findings are successfully attacked as clearly erroneous. *Byram v. United States,* 705 F.2d 1418 (5th Cir.1983) (rejecting distinction between ultimate and subsidiary facts in reviewing taxpayer's motivation with respect to capital asset). *See also* Fed.R.Civ.P. 52(a). Since the Government does not attack the district court's factual determinations, we decline to review them. The Government does argue, however, that the district court applied the wrong legal standard to the facts. We must, therefore, conduct a *de novo* analysis of the law surrounding the tax treatment of gains and

losses and the reach of the *Corn Products* doctrine. *See Hibernia National Bank v. United States,* 740 F.2d 382, 387 (5th Cir.1984) ("A failure by the district court to apply correctly the [tax] law and regulations is an error that may be corrected by this court on appeal.").

## III. WHEN IS A CAPITAL ASSET NOT A CAPITAL ASSET?

The *Corn Products* problem exists, of course, because the Internal Revenue Code (the "Code") gives taxpayers a break on capital gains while restricting the tax benefits available from capital losses.[16] Not surprisingly, then, taxpayers are wont to characterize their gains as capital and their losses as ordinary. Since the character of gain or loss depends on, among other things, the nature of the underlying asset,[17] the Code's definitions (and the judicial exceptions thereto) are of critical importance.

### A. *The Statutory Framework.*

The Code defines a capital asset by exclusion: all property is capital in nature

existing parameters of the *Corn Products* doctrine, we accept the Government's characterization of the district court's findings. We assume, therefore, that CTI's purchase of the Supermarkets stock impacted only upon its investment activities. In effect, we will treat CTI, for purposes of this appeal, as a pure holding or investment company.

The Government alternatively argues that, as a factual matter, consummating the Supermarkets deal could have had no effect on CTI's service relationship with its subsidiaries. Since the subsidiaries are tied to CTI by stock ownership, the Government argues, any change in CTI's reputation, for the better or worse, would not promote or impede the conduct of CTI's business. CTI's customers are, in effect, its captives. CTI responds that its reputation for fair dealing is important in its relationship with its subsidiaries, employees and the suppliers from whom it purchases on a centralized basis materials and services needed by its subsidiaries. Because of our resolution of the case, we need not address these issues.

**15.** CTI also argues that the Government's analysis artificially segregates CTI's activities into service and investment spheres. In reality, CTI

maintains, it is engaged in a single, consolidated enterprise in the baking and food products industry, to which its purchase of the Supermarkets stock was proximately related. Because we have assumed, for purposes of this appeal, that the Government has correctly characterized the district court's findings, we do not address this argument. *See* note 14, *supra.*

**16.** With respect to corporate taxpayers, capital gains are eligible for an alternative tax of 28% (which, depending upon the amount of taxable income, may be less than the tax imposed on ordinary income). I.R.C. § 1201(a). Capital losses, on the other hand, are only deductible to the extent of capital gains and do not reduce ordinary income. I.R.C. § 1211(a). They may, however, be carried back (three preceding tax years) or forward (five succeeding tax years) to reduce capital gain. I.R.C. § 1212(a).

**17.** Capital gains and losses, whether "short-term," "long-term," or "net," are defined in terms of gain or loss "from the sale or exchange of a capital asset." I.R.C. § 1222(1)–(8). Long-term gains and losses are distinguished from short-term gains and losses by the length of time the capital asset is held by the taxpayer. *Id.*

unless it falls within one of five statutory categories. Section 1221 provides:

> For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
>
> (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
>
> (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
>
> (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—
>
> (A) a taxpayer whose personal efforts created such property,
>
> (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or
>
> (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);
>
> (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1);
>
> (5) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, and which is held by—
>
> (A) a taxpayer who so received such publications, or
>
> (B) a taxpayer in whose hands the basis of such publication determined, for purposes of determining gain from a sale or exchange, in whole or in part by reference to the basis of such publication in the hands of a taxpayer described in subparagraph (A).

I.R.C. § 1221.

■ Corporate stock, unless held by a securities dealer,[18] is the quintessential example of a capital asset. *See generally* Troxell & Noall, *Judicial Erosion of the Concept of Securities as Capital Assets,* 19 Tax.L.Rev. 185, 186 (1964). If this case was governed solely by the Code, absent its judicial baggage, the Government would undeniably prevail. The Supermarkets stock does not fall within any of section 1221's exclusions and is, under a literal reading of the statute, a capital asset.

## B. *Corn Products.*

In *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), however, the Supreme Court held that the statutory exclusions from the capital asset definition should not be read literally. Rather, "the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly" to effectuate congressional intent: "[T]hat profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." *Id.* at 52, 76 S.Ct. at 24.

The facts of *Corn Products* are by now quite familiar: The taxpayer purchased corn futures on a commodities exchange to protect itself against shortages and price increases in the raw corn market. Because it lacked adequate storage facilities, Corn

---

18. *See, e.g., Comm'r v. Burnett,* 118 F.2d 659 (5th Cir.1941) (securities in hands of dealer, as opposed to trader, are "held ... for sale to customers in the ordinary course of [taxpayer's] trade or business," *see* I.R.C. § 1221(1), and are, therefore, not capital assets).

Products purchased corn futures at harvest time when the price appeared favorable and took delivery on the futures contracts as it needed corn in its manufacturing operations. In the summer, however, if corn was plentiful (and the price favorable), the futures were sold and corn was purchased directly on the spot market. Corn Products realized a profit from its futures trading, which it reported as capital gain on its income tax returns. The Commissioner, however, maintained that the gain from the commodities transactions was ordinary income. The Court held that, though the corn futures were literally within the statutory definition of a capital asset, they were ordinary assets in the hands of Corn Products.

The Court reasoned that Congress intended to reserve capital asset treatment for property which is not "the normal source of business income." *Id.* at 52, 76 S.Ct. at 24. Since the purchase of corn futures constituted an "integral part of [taxpayer's] manufacturing business," *id.* at 51, 76 S.Ct. at 23, the futures generated ordinary income upon disposition.

### C. *Expansion of the Corn Products Doctrine.*

*Corn Products* involved the characterization of gain resulting from repetitive, everyday transactions "vitally important to the taxpayer's business." *Id.* at 50, 76

S.Ct. at 23. Subsequent decisions, however, have seized upon the Court's departure from the constraints of the literal statutory definition and have applied its reasoning in a variety of factual settings less compelling than that before the Court in *Corn Products* itself.[19]

Many of the reported cases involve the acquisition of corporate securities as a means of ensuring a supply of raw materials available from the corporation whose stock is acquired.[20] *Corn Products* has not been limited, however, to this "source of supply" context. For example, we have applied *Corn Products* in characterizing the loss sustained upon sale of stock acquired to obtain for the taxpayer's business the expertise and experienced personnel of the acquired corporation.[21] The doctrine has also been applied to corporate securities acquired by a taxpayer to reduce the costs of exporting its products to a foreign market.[22]

The Seventh Circuit has characterized corporate securities as ordinary assets, under a *Corn Products* analysis, when purchased as a means of acquiring assets needed in the expansion of taxpayer's existing business.[23] Courts have also utilized *Corn Products'* release from the literal statutory definition of a capital asset to afford ordinary treatment to stock pur-

---

**19.** *See generally* 2 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 51.10.3 (1981) ("*Corn Products* has been extensively cited and applied, but only a few of these subsequent cases involve repetitive, everyday transactions like those that evoked the *Corn Products* doctrine").

**20.** *See, e.g., Booth Newspapers, Inc. v. United States,* 303 F.2d 916 (Ct.Cl.1962) (loss on sale of stock in papermill acquired by publishing company during newsprint shortage).

**21.** *Schlumberger Technology Corp. v. United States,* 443 F.2d 1115 (5th Cir.1971) (loss on sale of stock of corporations, and on bad debts owed by same, acquired for their computer expertise, which was needed to modernize taxpayer's data analysis methods, and the marketing contacts of their personnel). *Cf. Chemplast, Inc. v. Comm'r,* 60 T.C. 623 (1973), *aff'd,* 506 F.2d 1050 (3d Cir.1974) (bad debt owed by corporation

formed by taxpayer to attract expert, who demanded equity interest in venture, to help in developing technology for new applications of taxpayer's invention).

**22.** *See Pittsburg Reflector Co. v. Comm'r,* 27 T.C.M. (CCH) 377 (1968) (loss on sale of stock in Canadian corporation acquired because it was cheaper to ship unassembled products to Canada, to be assembled and sold by the acquired corporation, than to sell assembled products through a Canadian sales representative).

**23.** *See John J. Grier Co. v. United States,* 328 F.2d 163 (7th Cir.1964) (loss on sale of stock acquired by taxpayer-restauranteur to obtain new restaurant, owned in corporate form, to be operated under taxpayer's name; taxpayer purchased stock, rather than assets, to ensure acquisition of new restaurant's lease, direct assignment of which was not feasible).

chased to obtain (or retain) customers for taxpayer's services.[24]

## IV. MAY A HOLDING COMPANY UTILIZE THE CORN PRODUCTS DOCTRINE?

From these cases and others, the Government argues that corporate securities are ordinary assets under *Corn Products* only if purchased without an investment motive *and* as a necessary and integral act in the taxpayer's "business." CTI, on the other hand, asserts that the true test for determining when an otherwise-capital asset is an ordinary one is simply whether the taxpayer acquired the asset with an investment or a business purpose.

The essence of the Government's position is that (1) the holding of securities and collection of dividends is not a "business" for tax purposes and (2) accordingly, a stock acquisition that simply protects the acquirer's ability to make future stock acquisitions cannot satisfy the *Corn Products'* requirement of a necessary and integral link to a "business." In effect, the Government takes the position that a holding or investment company [25] that is not itself directly involved on an operational level can never have a "business purpose."

We reject the Government's position and refuse to adopt a rule that would automatically preclude an investment or holding company from utilizing the *Corn Products* rule. Rather, we believe that a corporation that owns securities and collects dividends is in fact engaged in a business for certain tax purposes. The Government is undoubtedly correct when it asserts that *Corn Products* does not apply unless the taxpayer establishes a link between the holding of the asset in question and the taxpayer's business.[26] We do not think that it follows, however, that a pure holding company can never avail itself of the *Corn Products* doctrine. We need not determine the precise parameters of the *Corn Products* doctrine as applied to companies engaged in traditional investment activities.[27] We simply hold that *Corn Products* can apply, if the trier of fact is convinced that there was no investment purpose,[28] when a holding company acquires an asset as an indirect means of incurring what would otherwise be a deductible business expense.

This conclusion follows from an analysis of the cases in the *Corn Products* line. Although broader readings have been suggested,[29] under "the most narrow formula-

---

24. *See, e.g., Steadman v. Comm'r,* 424 F.2d 1 (6th Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970) (stock purchased by attorney to protect position as general counsel for corporation); *Hagan v. United States,* 221 F.Supp. 248 (W.D.Ark.1963) (stock purchased by salesman to ensure that corporation would buy exclusively from him).

25. We use the terms "investment company" and "holding company" as synonyms referring to a company engaged solely in the acquisition of stock and the collection of dividends with no involvement in actual operations. We have assumed, for purposes of this appeal, that CTI is such a company. *See* note 14, *supra.*

26. This statement is nothing more than the converse of the truism that an asset acquired as an investment (which is not within a statutory exception to the capital asset definition) is a capital asset.

27. *See* note 29, *infra,* for a discussion of some of the broader readings of the doctrine that have been suggested.

28. Whether an asset is acquired with an investment or a business purpose is to be determined according to the test outlined in Part V, *infra.*

29. One commentator has suggested that there is support in the cases for at least three formulations of the doctrine other than the narrow formulation cited in the text:

A second and somewhat broader reading is that an asset is ordinary where the taxpayer's purpose in acquiring the apparent capital asset is in fact to acquire an underlying asset which produces ordinary income or loss on its sale. A third and even broader reading is where taxpayer's acquisition is motivated to augment or protect the taxpayer's ordinary business income. Last, and most broadly read, the business motive test is satisfied if a corporate taxpayer can establish that a subsidiary was acquired or created in order to carry on part of the corporate group's integrated business even though the parent cannot establish any direct benefit to its business.

Javaras, *Corporate Capital Gains and Losses—The Corn Products Doctrine,* 1974 Taxes 770, 772 (1974).

tion [of the *Corn Products* doctrine], an asset is ordinary only where the taxpayer's motive was to accomplish a result normally achieved by incurring a deductible expense." Javaras, *Corporate Capital Gains and Losses*, 1974 Taxes at 770.

■ In the source of supply cases, for example, corporate securities were acquired as an indirect expense in the purchase of raw materials. Direct expenses for the purchase of raw materials are, of course, deductible, as finished products are sold, because they are included in "the cost of goods sold." *See generally* 4 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 105.4.1. *See also Commissioner v. Bagley & Sewall*, 221 F.2d 944 (2d Cir. 1955) (securities purchased to be held in escrow as security for taxpayer's obligations under contract). *Hoover Co. v. Commissioner*, 72 T.C. 206 (1979), is not to the contrary.[30] If CTI purchased the Supermarkets stock solely as a substitute for incurring a deductible expense, without a coexisting investment purpose, it necessarily had a "business purpose" under *Corn Products*. To answer the Government's contention that CTI could not have had a business purpose as a matter of law, we will assume the truth of CTI's claim that its sole purpose in acquiring the Supermarkets' stock was to protect its good will. We turn therefore to an analysis of wheth-

er a direct expenditure by CTI to protect its goodwill as an acquirer of businesses would be deductible. Whether the district court correctly determined that CTI's sole purpose was to protect its goodwill is discussed in Part V, *infra*.

**A. *The Business of a Holding Company.***

■ The Government argues that a holding company is not engaged in a "business." We think it is clear, however, that the tax meaning of the term "business" varies with the context in which it is used. *Compare Asiatic Petroleum Co. v. Commissioner*, 79 F.2d 234 (2d Cir.1935) (pure holding company is engaged in business for purpose of statute authorizing Commissioner to allocate income and deductions among "trades or businesses" controlled by the same interests) *with Goodyear Investment Corp. v. Campbell*, 139 F.2d 188 (6th Cir. 1943) (holding company not "carrying on or doing business" for capital stock tax purposes). The Government has simply chosen to rely on those cases that express the meaning of "business" that suits its purpose on this appeal, without regard to the context in which the meaning was assigned.[31] We find those cases inapposite.

■ As we have said, the important context here, because it defines the boundaries of the narrowest formulation of the *Corn*

---

**30.** *Hoover* involved a taxpayer's attempts to guard against exchange losses occurring when the currency of countries in which its subsidiaries operated was devalued. Taxpayer engaged in "forward sale transactions" in foreign currency in an amount roughly equal to its net exposure to foreign exchange risk, measured by the value of its foreign investments. It reported gain and loss recognized on these transactions as ordinary income or loss, respectively. Although taxpayer expressly did not rely on the *Corn Products* doctrine, the opinion contains broad language to the effect that *Corn Products* cannot apply to expenditures for "the protection of a stock investment." *Id.* at 237. In reality, however, the court found that there was in fact no protection of taxpayer's investment and that cases like *Allied Chemical Corp.*, 305 F.2d at 433, and *Alleghany Corp.*, 28 T.C. at 298, allowing business deductions to holding companies for expenses relating to their investments, were distinguishable.

**31.** Our tax law at one time imposed a direct tax on the capital stock of corporations "carrying on or doing business." *See, e.g.,* 26 U.S.C. § 701 (1934). The cases cited by the Government established that a pure holding company was not engaged in a "business" and was, therefore, not liable for the tax. *See Continental Baking Corp. v. Higgins*, 130 F.2d 164 (2d Cir.1942); *Goodyear Investment*, 139 F.2d at 188.

The Government argues that we should apply the meaning of the term "business" espoused by these cases, despite their markedly different contexts, because of the presumption that terms used in different parts of the same statute have the same meaning. We are unconvinced by this argument for two reasons: (1) the *Corn Products* exception is not statutory and, more importantly, (2) the presumption that the Government cites is not conclusive but, rather, must yield to variations in factual and legal contexts. *See Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

*Products* doctrine, is the business deduction section of the Code. *See* I.R.C. § 162. For purposes of an ordinary and necessary business deduction, the business of a holding company

> consists of conserving and protecting its holdings, influencing, or directing when it can, the management of the companies in which it holds stock, so as to increase the value of its holdings and the income to be derived therefrom, the collection of dividends, the advantageous disposition of stocks in companies with whose management it is not satisfied; or where it appears desirable to do so, and reinvesting the proceeds, etc.

*Allied Chemical Corp. v. United States,* 305 F.2d 433, 437 (Ct.Cl.1962) (fees expended by holding company to contest SEC plan to liquidate corporation in which it held stock; held, deductible as ordinary and necessary business expense). *See also Alleghany Corp. v. Commissioner,* 28 T.C. 298 (1957). Thus, although a holding company does not conduct a business for purposes of the repealed capital stock tax, it need not capitalize all of its expenditures. We think it beyond question that a holding company is entitled to expense its ordinary and necessary costs not linked to the acquisition of specific assets. *See generally* 1 B. Bittker, *Federal Taxation* at ¶ 20.4.2. ("It is clear ... that the cost of investment advice, custodial services, safe-deposit box rentals, and similar expenses are deductible under IRC § 162 ... even if the [corporate] taxpayer invests only in capital assets and seeks long-term appreciation rather than current yield.").

■ Of course, it is not relevant that investment activities by individual taxpayers may not constitute a trade or business, for the tax law has long distinguished between individuals and corporations in this regard. *Compare Whipple v. Commissioner,* 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963) ("investing is not trade or business" for purposes of deducting business bad debt) *and Higgins v. Commissioner,* 312 U.S. 212, 216, 61 S.Ct. 475, 477, 85 L.Ed. 783 (1941) ("Management of one's own securities" is not a business

for purposes of deducting ordinary and necessary expenses) *with Allied Chemical Corp.,* 305 F.2d at 433 (corporation's investment activities constitute business). *But see Moller v. United States,* 553 F.Supp. 1071, 1 Cl.Ct. 25 (1982) (individuals' investment activities can constitute trade or business where more extensive than those in *Higgins* ). *Higgins,* of course, has been legislatively overruled by I.R.C. § 212 which allows deductions by individuals for expenses incurred in activities engaged in for profit. It is, we think, significant that Congress did not find it necessary to include corporations within I.R.C. § 212; the strong implication is that investment activities by a corporation do constitute a trade or business. *See* 1B Bittker, *Federal Taxation* at ¶ 20.1.2. ("As for corporations, the fact that Congress did not include them in IRC § 212 suggests the possibility that the term 'trade or business' as used by IRC § 162 was thought to be broad enough to embrace a corporation's activities in managing its own investments.").

### B. *Expenditures to Protect Goodwill as an Acquirer of Businesses.*

■ We turn, therefore, to an analysis of whether an expenditure by CTI to protect its goodwill and reputation would have been deductible as a business expense if it had not been accomplished indirectly through the acquisition of an otherwise-capital asset. It is clear that an expenditure to acquire goodwill must be capitalized. *See, e.g., Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) (expenditures to develop goodwill and reputation for taxpayer's new business; held, not deductible, but must be capitalized). It is equally clear, at least with respect to operating companies, that expenditures made to protect existing goodwill are deductible as ordinary and necessary business expenses under I.R.C. § 162. *See, e.g., Lutz v. Commissioner,* 282 F.2d 614, 615 (5th Cir.1960) (payments to protect "credit and standing in the industry"); *L. Heller & Son, Inc. v. Commissioner,* 12 T.C. 1109 (1949) (taxpayer's payments in

satisfaction of bankrupt subsidiaries' debts deductible as business expenses because made to protect taxpayer's reputation in business community). None of these cases involves the protection of the goodwill or reputation of a company whose sole activity is the acquisition of capital assets. We see no reason, however, to single out such companies for special treatment.

■■ The Government correctly points out that expenses incurred in the investigation of potential acquisition candidates are not deductible as current expenses, but must be capitalized with the cost of the capital asset acquired. *See, e.g., Ellis Banking Corp. v. Commissioner,* 688 F.2d 1376 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983) (expenditures for investigation of corporation in connection with proposed acquisition; held, not deductible as ordinary and necessary business expense). Said the court in *Union Mutual Life Insurance v. United States,* 570 F.2d 382 (1st Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978):

> Thus, the authorities clearly indicate that expenditures made with the *contemplation* that they will result in the creation of a capital asset cannot be deducted as ordinary and necessary business expenses even though that expectation is subsequently frustrated or defeated, as was the case here.

*Id.* at 382 (emphasis in original) (fees expended by real estate investor to evaluate investment opportunities; held, not currently deductible). In *Central Texas Savings & Loan v. United States,* 731 F.2d 1181 (5th Cir.1984), we applied this rule and held that expenditures made in investigating and establishing new branches of a savings and loan association must be capitalized.

The Government argues from these cases that direct expenditures by a holding company to protect its goodwill as an acquirer of businesses must also be capitalized. Therefore, the argument runs, stock purchased for the same purpose (though without an investment motive) is not eligible for *Corn Products* treatment.

We do not think that these cases support that proposition. They involve expenditures for investigation of the possible acquisition of specific capital assets. They do not involve general expenditures that enhance the company's overall ability to make acquisitions. In fact, the court in *Union Mutual Life Insurance,* 570 F.2d at 382, expressly recognized this distinction and noted that payments made as salaries to regular employees for the everyday analysis of potential investments, for example, may well warrant different tax treatment. *Id.* at 382 n. 8. *But compare* Rev.Rul. 73–580 (corporation's salary payments to employees working on acquisitions and mergers must be capitalized; may be deducted as loss under I.R.C. § 165 if merger or acquisition plan is abandoned) *with Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1241, 187 Ct.Cl. 635 (1969) (salaries paid to employee for investigating possible expansion into foreign markets through subsidiaries; held deductible).

We think that the Supreme Court has made this distinction important. In *Commissioner v. Lincoln Savings & Loan,* 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971), the Court delineated the difference between capital expenditures and deductible expenses: "What is important and controlling, we feel, is [whether] the ... payment serves to create or enhance ... what is essentially a separate and distinct asset." *Id.* at 354, 91 S.Ct. at 1899.[32] The cases cited by the Government, denying deductions for investment-related expenses, are entirely consistent with *Lincoln Savings:* the expenses at issue were linked to "separate and distinct" capital assets. *E.g., Central Texas Savings & Loan,* 731 F.2d

---

**32.** The Court also listed the requisites of a deductible business expense:

> To qualify as an allowable deduction under § 162(a) of the 1954 Code, an item must (1) be "paid or incurred during the taxable year," (2) be for "carrying on any trade or business," (3) be an "expense," (4) be a "necessary" expense, and (5) be an "ordinary" expense. *Id.* at 352, 91 S.Ct. at 1898.

at 1181 (new branch offices);[33] *Ellis Banking Corp.,* 688 F.2d at 1376 (corporate stock); *Union Mutual Life Insurance,* 570 F.2d at 382 (real estate developments). These cases do not, however, answer the question before us: whether a general expense, not related to a specific asset, that enhances a holding company's overall ability to make capital acquisitions is deductible.[34]

We have not been cited to a case that answers this specific question and our independent research has revealed none. We see no principled reason, however, for exempting holding and investment companies from the established rule that expenditures for the protection of existing goodwill are currently deductible.[35] Clearly, had CTI made direct expenditures that simply protected its existing goodwill as an acquirer of businesses, it would not have acquired a "separate and distinct" asset within the meaning of *Lincoln Savings.* Moreover, even the cases that hold that investigation expenses must be capitalized recognize that, if a capital acquisition does not ultimately come to pass, the expenses are deductible as ordinary losses in the year the investment project is abandoned. *E.g., Union Mutual Life,* 570 F.2d at 393. This strengthens our conclusion that, absent a link to a specific asset, general expenditures for protection of goodwill, though it is goodwill that impacts solely on the ability to make future investments, are deductible as ordinary and necessary business expenses.

▉ We are aware of the authority holding that, with respect to expenses incurred by individuals for the investigation of capital acquisitions that do not come to pass, an I.R.C. § 165 loss deduction is only available if the acquisition process has proceeded beyond the preliminary stage and has focused on a specific asset. Otherwise, general investigation costs are personal expenses which are not deductible. *See Bick v. Commissioner,* 37 T.C.M. 1591 (CCH) (1978) (deduction denied for individual's expenses in investigating foreign investment opportunities because (1) no § 162 trade or business; (2) merely preparatory; investment process not sufficiently advanced for § 165; (3) no property interest for § 212); *Frank v. Commissioner,* 20 T.C. 511 (1953) (same); Rev.Rul. 77–254 (individual's advertising expenses incurred in general search for businesses to acquire not deductible; legal fees incurred in drafting purchase agreement for acquisition that failed are deductible). These authorities denied deductions because the individual taxpayer-investors were not, under *Higgins,* engaged in a business and, until the search for capital acquisitions focused on a specific asset, had not engaged in a transaction for profit. They in no way cast doubt on our conclusion that a holding company, which is engaged in a business for purposes of deducting expenses, may deduct its general expenses, not linked to a specific asset, that enhance its overall ability to make capital acquisitions.

What we have said thus far does not, of course, mean that CTI's purchase of the Supermarkets stock is automatically qualified for *Corn Products* treatment. We have engaged in the analysis above simply to demonstrate that, assuming the truth of CTI's claims, *this* acquisition by *this* taxpayer is not automatically disqualified from *Corn Products* treatment. As we have said, a taxpayer that has allegedly acquired an otherwise-capital asset as an indirect

---

**33.** In fact, in *Central Texas,* we reached a result in conflict with a Fourth Circuit case decided on similar facts, *NCNB Corp. v. United States,* 684 F.2d 285 (4th Cir.1982). We rejected the reasoning of that case because we did not agree that new branch offices are not separate assets.

**34.** We asked this specific question at oral argument of this case and, as noted in the text, did not receive a definitive answer in the supplemental briefs filed by both parties.

**35.** Although the Government has not challenged the factual sufficiency of the record, we note that there was ample evidence indicating that CTI had a good reputation in the business community and that maintaining that reputation had a bearing on its ability to make future acquisitions.

means of incurring a deductible business expense is not, as the Government suggests, automatically precluded from asserting that *Corn Products* applies, simply because the taxpayer is engaged solely in investment activities. Rather, such a taxpayer, if his claims are proven, necessarily had a business purpose. Because CTI has alleged, in effect, that it purchased the Supermarkets stock as a substitute for incurring a business deduction, it is entitled, like any other taxpayer, to an opportunity to convince the fact finder that it has met the *Corn Products* test. We turn therefore to an analysis of the test of the *Corn Products* exception to capital asset treatment.

## V. THE CORN PRODUCTS TEST.

This is not the first time we have been called upon to define the limits of the *Corn Products* doctrine. In *Schlumberger*, 443 F.2d at 1115, we rejected two tests of the *Corn Products* exception urged upon us by the Government: the "temporary business expedient"[36] test and the "protection-expansion"[37] test. Instead, we followed the reasoning of the Court of Claims:

> "[I]f securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be

found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code."

\* \* \* \* \* \*

> In determining whether the transaction involved falls within the "ordinary" or "investment" categories, the Court must consider " \* \* \* the circumstances of the transaction (its factual background, the necessities of the particular business involved at the particular time involved, and the intentions of the taxpayer, both at the time the securities were originally purchased and at the time they were disposed of) \* \* \* "

*Id.* at 1120 (quoting *Booth Newspapers*, 303 F.2d at 921).

As noted above, the Government insists that the *Corn Products* test requires a finding that the asset was purchased as a "necessary and integral act" in the conduct of taxpayer's business.[38] We think that conclusion results from a mechanical reading of the cases. Indeed, there are many cases, including *Schlumberger*,[39] that utilize the "necessary and integral" language in discussing the *Corn Products* test. Likewise, however, there are many cases, including *Schlumberger*,[40] that seem to cast the test in terms of "business motive v. investment motive." In fact, if we were to canvass the cases and mechanically extract language from them, we could come

---

**36.** The "temporary business expedient" test asks whether the asset was purchased "to acquire an inventory or protect a source of supply." *Id.* at 1120.

**37.** The "protection-expansion" test can be summarized as follows:

> An acquisition made to protect an existing business would qualify for ordinary loss treatment, while an acquisition made to expand the business would qualify for capital loss treatment.

*Id.*

**38.** It seems apparent that the Government makes this argument primarily as a foundation for its position that CTI, as a holding company not engaged in a "business," is automatically excluded, whatever its purpose, from the scope

of *Corn Products* coverage. Although we reject that argument, we read the Government's brief also to suggest that a trier of fact applying the *Corn Products* doctrine must make a separate and distinct finding of a necessary and integral act. Since the parties have suggested that one alternative for resolution of this case is a remand for additional findings on whether the purchase of Supermarkets stock was a "necessary and integral act," we must consider whether that is in fact a separate element of the *Corn Products* test.

**39.** "[I]f securities are purchased as an integral and necessary act ...." *Id.*

**40.** "[S]tock ... acquired and debt incurred with a business rather than an investment motive ...." *Id.*

up with innumerable "tests" for application of the *Corn Products* doctrine.[41] We think it important, however, to examine the substance of the cases.

■ The cases indicate that the test of *Corn Products* is whether the asset was acquired with a business purpose or an investment purpose. As we have said, a taxpayer has a business purpose, in its most restrictive sense, if he intends to accomplish an objective for which a direct expenditure would be deductible under I.R.C. § 162. To determine a taxpayer's purpose, the trier of fact must analyze all of the circumstances surrounding the transaction. Taxpayer's claims of a subjective lack of investment intent do not automatically control. Rather, the taxpayer's stated intent is simply one factor in determining the existence of business or investment purpose. A finding that an acquisition was a "necessary and integral act" in the taxpayer's business is not, as the Government suggests, a separate element of the test upon which an explicit finding is required. Rather, like subjective intent, the degree of business need is one factor in determining taxpayer's motive.[42]

---

**41.** *See, e.g., Pittsburg Reflector Co. v. Comm'r,* 27 T.C.M. (CCH) at 379 ("investment purpose" or "directly related to ... business"); *Irwin v. United States,* 558 F.2d 249, 252 (5th Cir.1977) ("motive ... to promote [taxpayer's] business"); *FS Services, Inc. v. United States,* 413 F.2d 548, 554, 188 Ct.Cl. 874 (1969) ("proper and valid business considerations rather than an intent to make a capital investment"); *Mansfield Journal Co. v. Comm'r,* 274 F.2d 284, 286 (6th Cir.1960) ("motive ... of a capital investor ... [or] of a far-sighted manufacturer"); *John J. Grier Co. v. United States,* 328 F.2d at 165 ("incident to conduct of ... business and not for investment"); *Booth Newspapers, Inc. v. United States,* 303 F.2d at 921 ("eminently reasonable [business] expedient," not "investment-minded"); *Tulane Hardwood Lumber Co. v. Comm'r,* 24 T.C. 1146, 1150 (1955) ("reasonable and necessary act in the conduct of its business").

Cases that contain "necessary and integral act" language seem to utilize the phrase as a synonym for "business purpose." On the one hand, they contrast business motive with investment motive; on the other hand, they talk in terms of a necessary and integral business act as the antithesis of an act motivated by an investment purpose. *See, e.g., Midland Distributors, Inc. v. United States,* 481 F.2d 730, 734 (5th Cir.1973) ("taxpayer purchased the assets as an integral and necessary act in the conduct of its business rather than being motivated by an investment purpose"). As we have said, we decline to engage in such word games. We simply reaffirm that the test requires, as it has in this circuit at least since *Schlumberger,* an analysis of all the facts and circumstances surrounding the transaction.

**42.** *Schlumberger* itself holds that the application of *Corn Products* depends on an analysis of all of the circumstances surrounding the acquisition. *Id.* To our mind, *Schlumberger* also dispenses with the argument that application of *Corn Products* depends on a specific finding with respect to business need. In rejecting the "temporary business expedient" test, we said:

> Contrary to the Government's contention, we believe that temporary business expediency, properly viewed, is merely a factual element that, under appropriate circumstances, justifies a taxpayer's acquisition of what would otherwise be a capital asset, and, in turn, requires the acquiring taxpayer, if he desires to avoid capital asset treatment of the acquisition, to dispose of the asset once the temporary condition being remedied has terminated and the nature of the asset has changed from business purpose to investment purpose. Finding no basis for elevating the condition of temporary business expediency from its present status to that of a controlling standard, we reject the Government's first contention.

*Id.* at 1121. We again reject the Government's attempt to make the degree of business need, though phrased in a slightly different manner, a controlling standard. *See generally* Troxell & Noall, *Judicial Erosion,* 19 Tax.L.Rev. at 198 (discussing degree of business need as simply one of many factors) ("the degree of [business] need which must be shown to form the basis of a claim that securities are non-capital is a rather modest one").

Our decision in *Irwin v. United States,* 558 F.2d at 249 is not to the contrary. In *Irwin,* we reversed summary judgment in favor of a taxpayer-attorney who claimed that, under *Corn Products,* the stock that he purchased to secure the legal work of a corporation generated an ordinary loss when it became worthless. We held that unresolved questions of fact required reversal of the summary judgment. In remanding to determine if taxpayer had a business motive in acquiring the stock, we said that, on remand, taxpayer "must prove that the purchase of the stock in its entirety was necessary for the acquisition of" the corporation's legal business. *Id.* at 252. This statement in no way elevates business need to the status of a separate element of the *Corn Products* test. It is simply a recognition that, on the peculiar facts of that case, taxpayer's claim was not supportable if he could

■ In short, we hold that the *Corn Products* doctrine is triggered by a finding of business purpose, as opposed to investment purpose, in acquiring what would otherwise be a capital asset. The inquiry into taxpayer's purpose requires an objective evaluation of all of the circumstances surrounding the transaction. Relevant factors include (1) taxpayer's statements of its subjective intent at the time of acquisition;[43] (2) taxpayer's statements of its subjective intent at the time of disposition;[44] (3) the needs of the particular business;[45] (4) the length of time the asset was held;[46] (5) the nature of taxpayer's other business and investment activities;[47] and (6) the business and investment advantages that might reasonably be expected to flow from the acquisition or expenditure.[48]

We wish to stress that our reliance on the taxpayer's purpose or motive[49] is not intended to place ordinary or capital treatment at the whim of the taxpayer. We are acutely aware of the possibility that a taxpayer's recollection of his intent at the time an asset was acquired may be colored by whether he ultimately recognizes gain or loss upon disposition of the asset. Legislative solutions to this problem have been suggested.[50] In the meantime, we are confident that courts can, by evaluating the objective factors outlined above, continue to avoid the whipsaw potential that reliance upon subjective intent might well create.

## VI.  CORN  PRODUCTS  APPLIED  TO SUPERMARKETS STOCK.

■ We are satisfied that the findings of the district court in the instant case are sufficient to support its judgment. The court stated that, in applying the *Corn Products* doctrine, "[t]he distinction to be made is whether the taxpayer is dealing with the asset as a capital asset or is it being held for some other purpose?" 552 F.Supp. at 358. Although this statement is an inartful expression of the *Corn Products* test as we have outlined it, it is clear from the district court's opinion that the court determined that CTI purchased the stock for a business purpose, not an investment purpose. *See* 552 F.Supp. at 358 ("original investment motive ... played no part in the consummation of the bargain"); 552 F.Supp. at 359 ("Plaintiff had only the single motive of wanting to preserve its goodwill"). It is also clear that the district court reviewed all of the circumstances surrounding the Supermarkets deal and considered most of the factors that inform the inquiry into business or investment purpose.[51]

---

have obtained the legal business without purchasing the stock.

**43.** *E.g., Schlumberger,* 443 F.2d at 1120.

**44.** *E.g., Gulftex Drug Co. v. Comm'r,* 29 T.C. 118, 121 (1957) (changed intent between time of acquisition and time of disposition), *aff'd per curiam,* 261 F.2d 238 (5th Cir.1958).

**45.** *E.g., Schlumberger,* 443 F.2d at 1120.

**46.** *E.g., Gulftex Drug,* 29 T.C. at 121 (stock held for longer than required to accomplish business purpose).

**47.** *E.g., Electrical Fittings Corp. v. Comm'r,* 33 T.C. 1026, 1031 (1960) ("No other securities were owned by [taxpayer].").

**48.** *E.g., Tulane Hardwood Lumber Co. v. Comm'r,* 24 T.C. 1146, 1148 (1955) (debenture was "unattractive as an investment"); *FS Services, Inc. v. United States,* 413 F.2d at 550 ("it became apparent that [stock was] not an attractive investment by objective standards").

**49.** We certainly do not intend to engage in the kind of semantic games that have sometimes been played in the tax arena. *See, e.g., Comm'r v. Duberstein,* 363 U.S. 278, 286, 80 S.Ct. 1190, 1197, 4 L.Ed.2d 1218 (1960) (should test be phrased in terms of "motive" or "intent"?). *See generally* Blum, *Motive, Intent, and Purpose in Federal Income Taxation,* 34 Chi.L.Rev. 485 (1966–1967).

**50.** It has been suggested that, at the time of aquisition, taxpayers be required to declare their purpose in holding stock.

**51.** It is true that the district court's opinion does not expressly set forth and individually analyze the factors that we have outlined. Read as a whole, the opinion does indicate, however, that the court considered: (1) taxpayer's subjective intent at the time of the Preliminary Agreement, the October Modification, the Final Agreement and sale of the stock, *see, e.g.,* 552 F.Supp. at 357 ("Plaintiff decided to go through with the deal because it was afraid that to do otherwise would taint its business reputation ...."); (2) the

The Government complains that there is no finding that the acquisition of Supermarkets stock was a "necessary and integral" act in CTI's business. As we have said, however, the degree of business need is but one factor in determining whether an asset falls within the *Corn Products* exception. The district court did not ignore altogether the necessity of carrying out the Supermarkets deal.[52] At any rate, we would not find such a failure fatal to the court's judgment. We employ many tests that require an examination of more than one factor. The essence of such tests is that the absence of one factor is not controlling if the existence of others dictates a given result. *See, e.g., Byram,* 705 F.2d at 1424 ("specific factors, or combinations of them, are not necessarily controlling"). Since the Government does not attack the district court's finding that CTI had a busi-

ness purpose, we need not determine whether, assuming a low degree of business need, the record supports the court's conclusion.[53]

Although we are not called upon to review the fact findings of the district court, we wish, because the Government has argued that application of *Corn Products* on these facts will greatly expand the doctrine, to note how narrow our holding actually is. First, we note what this case does not involve: this is not a case of a mixed motive or purpose;[54] the district court found that CTI had a "single motive" in purchasing the Supermarkets stock. 552 F.Supp. at 359. Nor is this a case where a taxpayer has, after an investment has gone sour, dreamed up a business purpose for the transaction, in order to obtain more favorable tax treatment;[55] the district

---

length of time the asset was held, *see* 552 F.Supp. at 357; (3) the nature of taxpayer's other investment and business activities, *see* 552 F.Supp. at 356; (4) the business and investment advantages that might reasonably be expected to flow from the acquisition, *see* 552 F.Supp. at 357 ("Plaintiff knew ... that Supermarkets' prospects were dim"); and (5) the needs of the particular business, *see* 552 F.Supp. at 357 ("Ample evidence has been presented that Plaintiff has always dealt fairly with those that it has come in contact with. This has resulted in an excellent reputation and a large amount of goodwill for Plaintiff in both the domestic and international market place.").

While a more clearly stated factor-by-factor analysis would undoubtedly aid us in reviewing lower court judgments, we are persuaded that the district court here adequately reviewed all the circumstances of the Supermarkets' deal and that its conclusion cannot be faulted for application of an erroneous legal standard. Since the Government does not attack the court's specific fact findings, that essentially ends our review of this matter.

**52.** The court stated:

Any discussion of the reasonableness of or necessity for the expenditure [in the Supermarkets stock purchase price] in excess of fair market value [of the Supermarkets stock] will be pretermitted as the issues, above, as framed by the parties appear to subsume the basic reasonableness of Plaintiff's carrying out the transaction.

552 F.Supp. at 359. We could construe this construction of the parties' stipulation as a finding of fact which, because it is not attacked by the Government as clearly erroneous, must stand. Alternatively, as noted in the text, the

failure to address the reasonableness and necessity of the transaction is not fatal because these are not *sine qua non's* for successful application of the test and the Government has not attacked the ultimate finding that CTI purchased the Supermarkets stock with a business motive.

**53.** CTI argues that, although the Government purports to accept the district court's fact findings, its legal arguments are simply attacks on the factual sufficiency of the record in disguise. We decline to recharacterize the Government's position. We simply note, without deciding the factual sufficiency of the record, that the only factor that militates against the district court's finding is the extent of CTI's investment activities.

**54.** The rule with respect to mixed-motive cases has recently changed. At one point, it was held that the taxpayer's predominant motive controls. *See* Rev.Rul. 75–13, 1975–1 C.B. 67. More recently, it has been held that a predominant business motive is insufficient to trigger ordinary asset treatment if a non-predominant, but substantial, investment motive was also at work. *See W.W. Windle Co. v. Comm'r,* 65 T.C. 694 (1976), *cert. denied,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977); Rev.Rul. 78–94, 1978–1 C.B. 58. Since this is a single-purpose case, we of course decline to consider the merits of these alternative tests.

**55.** We think the objective test we have outlined is sufficient to weed out spurious claims. In this case, for example, it is not necessary to rely on taxpayer's naked claim that it consummated a transaction solely to protect its goodwill. Rather, this claim is substantiated by objective

court found that CTI knew, when the deal closed, that it was making what, from an investment point of view, was an imprudent purchase. Finally, this is not a case in which the taxpayer has entered into a transaction solely for its tax consequences; the district court found "not the slightest suggestion" that Supermarkets was motivated by the potential tax consequences of the deal. 552 F.Supp. at 357.

Rather, this is a case in which a taxpayer made a purchase it was not obligated to make, fully expecting to lose money on the deal, for the sole purpose of accomplishing an objective for which a direct expenditure would be deductible as an ordinary and necessary business expense. The parties have agreed that this case presents a question "of first and last impression," 552 F.Supp. at 355; if ever a taxpayer makes such a purchase again, we see no reason to deny him ordinary loss treatment.[56]

This is also a case in which the taxpayer's motivation changed during the course of the transaction. A change in purpose has been given effect when it favors the Government; we see no reason to deny it effect when it favors the taxpayer. *See, e.g., Gulftex Drug,* 79 T.C. at 121 (stock originally purchased to ensure source of supply, but held long after need for supply ended; held, purpose changed from business to investment).

## VII.  CONCLUSION.

We reject the Government's claim that a holding or investment company may never utilize the *Corn Products* exception to capital asset treatment. The district court did not apply an erroneous legal standard and, since its fact findings are not attacked, we affirm its judgment that CTI is entitled to an ordinary loss deduction in 1975. Therefore, we need not reach the issues raised by CTI's cross appeal.

AFFIRMED.

factors, not the least of which is the fact that taxpayer was not bound to close the deal. *Cf. Nalco Chemical Co. v. United States,* 561 F.Supp. 1274, 1280 (N.D.Ill.1983) ("A taxpayer could always assert that its business reputation depend-

ed upon its timely satisfaction of its outstanding obligations.").

56.  Or, if gain is realized, to prevent the Commissioner from taxing it at ordinary rates.