**ARKANSAS BEST CORPORATION AND SUBSIDIARIES, Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**ARKANSAS BEST CORPORATION AND SUBSIDIARIES, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**Nos. 85–1702, 85–1818.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1986.

Decided Sept. 9, 1986.

Hanson, Senior District Judge, sitting by designation, dissented and filed opinion.

Vester T. Hughes, Jr., Dallas, Tex., for appellant.

Ernest J. Brown, Washington, D.C., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.

BOWMAN, Circuit Judge.

The issue in this case is whether a corporate taxpayer is entitled to ordinary loss treatment for losses incurred on transactions in the capital stock of another corporation. Both Arkansas Best Corporation (Arkansas Best) and the Commissioner of Internal Revenue (Commissioner) appeal the Tax Court's judgment upholding in part and disallowing in part the Commissioner's treatment of Arkansas Best's losses on such transactions as capital losses. *Arkansas Best Corp. & Subsidiaries v. Commissioner*, 83 T.C. 640 (1984). Arkansas Best also appeals the court's ruling upholding the Commissioner's disallowance of a claimed bad debt deduction. *Id.* at 660–62. We reverse insofar as the Tax Court allowed ordinary loss treatment for any of the capital stock transactions. In all other respects, we affirm.

---

* The HONORABLE WILLIAM C. HANSON, Senior District Judge for the Southern District of Iowa, sitting by designation.

## I.

Arkansas Best is a diversified holding company. Its subsidiaries are engaged in various endeavors including interstate trucking, new tire sales, used tire retreading, and data processing. In 1968, Arkansas Best acquired approximately 65% of the stock of the National Bank of Commerce (Bank). In 1970, Congress amended the Bank Holding Company Act, Pub.L. No. 91–607, Title 1, § 103, 84 Stat. 1763 (codified at 12 U.S.C. § 1841 *et seq.*), to prohibit bank holding companies such as Arkansas Best from acquiring nonbanking businesses. Thereafter, in August 1971, Arkansas Best filed a notice of divestiture and began trying to sell its Bank stock. Once the notice was filed, Arkansas Best, although still a bank holding company, was free to acquire nonbanking businesses.

Because the Bank had made a series of bad loans, selling the Bank stock proved difficult. While actively trying to sell its interest in the Bank, Arkansas Best participated in preemptive rights offerings and capital calls to improve the Bank's capital structure. In 1972, Arkansas Best also bought the Bank president's personal holdings of Bank stock to secure his resignation and noninterference in the sale of Arkansas Best's interest in the Bank shares. In addition, in 1974 Arkansas Best bought the Bank stock held by one of its subsidiaries, an insurance company.

In 1975, Arkansas Best finally was able to sell over half of its holdings of Bank stock to a group of Texas investors. It received cash and a nonrecourse note secured by the stock. Shortly thereafter, Arkansas Best's independent auditors recommended that it charge off its books $4,485,876 of the face amount of the note, although the note was not in default, reducing its basis to $1,520,300. Three months later, Arkansas Best sold the note for $1,652,500. It also granted a third party an option to purchase its remaining shares of Bank stock in installments; by the end of 1980, Arkansas Best no longer held any shares of Bank stock. On its 1975 income tax return, Arkansas Best claimed an ordinary loss deduction of $9,995,688 from the disposition of the Bank stock, and on its 1976 income tax return, it claimed a deduction for an ordinary loss of $4,353,656 from the sale of the note. The Commissioner disallowed both deductions, deciding that the losses resulting from the sales of stock were capital losses subject to 26 U.S.C. § 1221. Arkansas Best challenged those disallowances in a petition to the Tax Court. As an alternative in its petition, Arkansas Best claimed it was entitled to a deduction on its 1975 income tax return of $4,485,876 for the partial worthlessness of the note. Before the Tax Court, Arkansas Best dropped the 1976 claimed deduction and asserted only the claim for a 1975 deduction for the partial worthlessness (bad debt) of the note.

The Tax Court held that the loss realized on stock acquired from 1968 through 1972 was a capital loss because the Bank was not an integral and necessary part of Arkansas Best's business. The shares were an investment. 83 T.C. at 655. However, the court also held that the purchase of stock from the Bank president in 1972 was motivated by business purposes and that the loss upon sale of that stock was entitled to ordinary loss treatment. *Id.* at 657. Similarly, the court found that Arkansas Best's purchases of Bank stock after 1972 were made to protect its business reputation, and therefore that it was entitled to ordinary loss treatment for losses realized on the disposition of Bank stock acquired after 1972, except in the case of Bank stock that Arkansas Best acquired from a subsidiary in 1974. *Id.* The court further held that the Commissioner had not abused his discretion in denying the deduction for the partial worthlessness of the note as claimed in Arkansas Best's 1975 income tax return. *Id.* at 661.

On appeal, Arkansas Best challenges three aspects of the Tax Court's decision: (1) that its losses realized on stock acquired in preemptive rights offerings were not entitled to ordinary loss treatment; (2) that it is not entitled to ordinary loss treatment on its losses from the Bank stock pur-

chased from its subsidiary; and (3) that it is not entitled to a bad debt deduction for the 1975 tax year for the losses attributable to the nonrecourse note. The Commissioner appeals the Tax Court's decision that Arkansas Best is entitled to ordinary loss treatment for losses incurred on stock acquired after 1972 and for losses incurred on stock acquired from the Bank president.

## II.

Arkansas Best argues that all the purchases of Bank stock it made after declaring it would divest itself of the stock were made in the ordinary course of business. Distinguishing its concededly pre-August 1971 investment motives for buying the Bank stock, Arkansas Best asserts that its subsequent purchases were intended to preserve its business reputation by preventing the Bank from failing, and that losses incurred on the sale of the stock so acquired are ordinary business expenses that it can deduct in full from gross income.

Whether these arguments have merit depends upon whether any of the Bank stock that Arkansas Best acquired can be characterized as not being a "capital asset" within the meaning of 26 U.S.C. § 1221. This section establishes a general rule defining capital asset as "property held by the taxpayer (whether or not connected with his trade or business)...." The corresponding federal regulation, 26 C.F.R. § 1.1221–1(a), states that "[t]he term 'capital assets' includes all classes of property not specifically excluded by section 1221." The property that section 1221 excludes from the general rule is (1) stock in trade or inventory; (2) business property subject to the depreciation allowance or real property used in business; (3) copyrights, literary or artistic compositions, and similar property; (4) business-related accounts or notes receivable; and (5) federal government publications. Because capital stock plainly does not fall into any of the last four categories,

we consider only the first exception, 26 U.S.C. § 1221(1), which excludes from "capital asset"

> stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business....

Generally, capital stock would meet this exception only if the taxpayer's business consisted of dealing in securities. *See Campbell Taggart, Inc. v. United States*, 744 F.2d 442, 449 (5th Cir.1984); 3A J. Rabkin & M. Johnson, *Federal Income, Gift and Estate Taxation* § 34.01A(1), at 3405a (1986).[1] Arkansas Best is not a dealer in securities. It is a holding company which provides management services to its subsidiaries in exchange for fees. Arkansas Best also realizes income from the dividends it receives on the stock it holds. Arkansas Best did not hold its Bank stock and it never has held its stock in any of its subsidiaries for sale to "customers." Rather, it holds capital stock to secure a controlling interest in each subsidiary and to derive income therefrom.

■ We conclude that the Bank stock was a capital asset because it does not fall into one of the statutory exceptions. The underlying purpose of section 1221 and its legislative history reinforce our conclusion. According to H.R.Rep. 704, 73d Cong. 2d Sess. (1934), the purpose of the tax code amendments, part of which defined "capital asset," was to increase revenue by preventing tax avoidance. *Id.* at 1. Elsewhere, the report specifically refers to the definition of capital asset: "It will be noted that the definition includes all property, except as specifically excluded." *Id.* at 31. This language is virtually identical to that of Federal Regulation 1.1221–1(a). *See generally* Troxell & Noall, *Judicial Erosion of*

---

1. If Arkansas Best were characterized as dealing in securities, it would be subject to the capital gains and ordinary loss provisions of 26 U.S.C. § 1236, which singles out security dealers for special treatment, rather than to section 1221.

*the Concept of Securities as Capital Assets,* 19 Tax L. Rev. 185, 186 (1964).

Although a literal reading of section 1221 clearly requires capital stock to be treated as a capital asset, the decision of the Supreme Court in *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), placed a judicial gloss on the section. In that case, the Court considered the taxpayer's contention that income from trading in corn futures was entitled to capital gains treatment. The Court found that the purchases of corn futures by the taxpayer, which was a manufacturer of products derived from corn, were important to its business because they assured a source of raw material for less than the cost of building additional storage facilities. The Court likened the corn futures contracts to a stored inventory of raw corn, 350 U.S. at 50, 76 S.Ct. at 23, and held that under section 117 (identical for our purposes to section 1221) the taxpayer was not entitled to treat the profit made on the corn futures transactions as capital gains; rather, those profits were ordinary income. *See id.* at 51–52, 76 S.Ct. at 23–24, 100 L.Ed. 29.

The Supreme Court recognized in *Corn Products* that the taxpayer's transactions did not fall within the literal language of the exclusions in section 117. The Court reasoned, however, that

> Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than [as] capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. ... Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly.

*Id.* (citations omitted).

Our Court has declined all previous invitations to extend *Corn Products* beyond its facts. In *Municipal Bond Corp. v. Commissioner,* 382 F.2d 184 (8th Cir.1967), our Court adhered to the view expressed by the Supreme Court in *Malat v. Riddell,* 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966), that the purpose of section 1221 is to differentiate between (1) the profit and loss attributable to daily business operations and (2) the change in value of an asset accruing over a substantial time period. Our Court held that there was no substantial evidence to support the Tax Court's finding that the taxpayer's real estate had been acquired primarily for sale in the ordinary course of business. Therefore, we held that the proceeds of the sale of the property were entitled to capital gains treatment. *Municipal Bond,* 382 F.2d at 187. *See Vaaler v. United States,* 454 F.2d 1120, 1122–23 (8th Cir.1972) (contract for performance of personal services is not a capital asset and lump sum paid to extinguish the right to render such services is ordinary income); *Frank v. Commissioner,* 321 F.2d 143, 148–49 (8th Cir.1963) (taxpayers were engaged in the business of selling stock; thus the gains realized from stock transactions were not entitled to capital asset treatment). In *Stephens, Inc. v. United States,* 464 F.2d 53, 57–58 (8th Cir. 1972), *cert. denied,* 409 U.S. 1118, 93 S.Ct. 911, 34 L.Ed.2d 702 (1973), this Court held that " 'investor' status attaches to anyone, including a recognized 'dealer,' who acquires securities with the primary intent to profit from their income yield." The Court concluded that the investment company was not a "dealer" entitled to an ordinary loss deduction for shares of corporate stock purchased with a view to gaining an economic advantage through receipt of dividends and an increase in the market price of the shares.

In *M.F.A. Central Cooperative v. Bookwalter,* 427 F.2d 1341 (8th Cir.1970), *cert. denied,* 405 U.S. 1045, 92 S.Ct. 1303, 31 L.Ed.2d 588 (1972), this Court anticipated the result of a later Supreme Court decision involving identical facts, *United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972). In *Mississippi Chemical,* the Supreme Court based its characterization of

capital stock as a capital asset solely on the language of section 1221, and ignored its previous decision in *Corn Products* entirely. Under the Farm Credit Act of 1933, 12 U.S.C. § 1134 *et seq.*, the taxpayers were required to make quarterly purchases of the stock of the regional Bank for Cooperatives (Regional Bank) in amounts tied to their interest payments to the Regional Bank. On their tax returns, the taxpayers claimed interest expense deductions for the stock. The Supreme Court held that since the stock was "of value in more than one taxable year, it is a capital asset within the meaning of § 1221 of the Internal Revenue Code, and its cost is nondeductible." 405 U.S. at 310, 92 S.Ct. at 915.

In *M.F.A. Central Cooperative*, the taxpayers similarly were required under the Farm Credit Act of 1933 to invest in capital stock of the Regional Bank in an amount dependent upon the interest they owed on their Regional Bank loans. In deciding the case, this Court, like the Supreme Court later, relied upon the plain language of section 1221 and found that the stock fully met the definition of capital asset and did not satisfy any of the section 1221 exclusions. 427 F.2d at 1343. Our Court therefore held that the stock was a capital asset and that the purchase price could not be considered an ordinary business expense. *Id.* at 1344.

Although *Mississippi Chemical* and *M.F.A. Central Cooperative* deal with the tax treatment of the acquisition cost of capital stock rather than the tax treatment of gains or losses upon the disposition of capital stock, we find no principled basis upon which to distinguish those cases from the present case. We thus hold that Arkansas Best's losses upon disposition of the Bank stock are not entitled to ordinary loss treatment, regardless of when or why the stock was acquired.

We acknowledge that in post-*Corn Products* decisions some federal courts have taken the position that capital stock is not a capital asset when acquired to assure a supply of raw materials vital to the taxpayer's business, to preserve an existing business, or even to pursue new business. Note, *The Corn Products Doctrine and Its Application to Partnership Interests*, 79 Colum.L.Rev. 341, 343 (1979); Troxell & Noall, *supra*, at 196–207. A test that some courts apply is the business purpose-investment purpose test: capital stock acquired for business purposes is classified as an ordinary asset, and capital stock acquired for investment purposes is classified as a capital asset. *See Booth Newspapers v. United States*, 303 F.2d 916, 921 (Ct.Cl. 1962); *Dearborn Co. v. United States*, 444 F.2d 1145, 1166 (Ct.Cl.1971). Other courts have rejected this test, at least for situations in which the taxpayer had mixed motives for acquiring the asset, and have replaced it with a substantial investment purpose test. Note, *supra*, at 347. *See, e.g., W.W. Windle Co. v. Commissioner*, 65 T.C. 694, 703–04 (1976), *appeal dismissed*, 550 F.2d 43 (1st Cir.1977), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977); *Wright v. Commissioner*, 756 F.2d 1039, 1041–42 (4th Cir.1985). Under this test, property is treated as an ordinary asset only if the taxpayer bought and retained it without a substantial investment purpose. Note, *supra*, at 347; *see W.W. Windle*, 65 T.C. at 712, 713, 714 n. 15. With all due respect to these courts, it is clear to us that both tests lack a basis in the statutory language, and we reject them.

The case most closely analogous to the one before us is the Fifth Circuit's decision in *Campbell Taggart*, 744 F.2d at 442. There, a holding company that derived its income from service fees and dividends from its subsidiaries negotiated the purchase of the capital stock of a supermarket chain in Spain. Before the purchase was consummated, Campbell Taggart discovered problems in the chain's financial condition and decided to sell the 25% interest it previously had acquired during the negotiations. It nevertheless proceeded with the final purchase agreement and purchased an additional 25% interest as the parties originally had contemplated. Selling the stock at a substantial loss thereafter, it claimed an ordinary deduction for the loss incurred.

Campbell Taggart argued that it consummated the final purchase only to protect its good will and reputation, and that "because it lacked an investment motive ... the stock, which all agree is normally a capital asset, was an ordinary asset under the *Corn Products* doctrine." *Id.* at 446 (footnote omitted). The Fifth Circuit concluded that stock is entitled to ordinary asset treatment when there is no investment purpose and it was acquired as an indirect means of incurring otherwise deductible business expenses. *Id.* at 451. The court held that "the *Corn Products* doctrine is triggered by a finding of business purpose, as opposed to investment purpose, in acquiring what would otherwise be a capital asset." *Id.* at 458.

For the reasons delineated above, we do not agree with the Fifth Circuit's interpretation of section 1221. We do not read *Corn Products* as either requiring or permitting the courts to decide that capital stock can be anything other than a capital asset under section 1221. It seems to us that one of the last places where the legal system deliberately should foster subjectivity and uncertainty is in the tax code. *Corn Products* and its progeny, which we respectfully view as misbegotten, have done precisely that, leading to increased recourse to the administrative and judicial processes to resolve conflicting contentions about taxpayers' motivations in purchasing capital stock. Congress could have written section 1221 to incorporate some sort of exception regarding capital stock, just as it recognized the unique position of securities dealers in 26 U.S.C. § 1236, but it did not do so. We believe that the judiciary lacks authority to create exceptions to section 1221 that Congress did not choose to make.

### III.

The final issue is whether the Tax Court properly ruled that Arkansas Best was not entitled to a partial bad debt deduction for 1975 based on its write-down of the nonrecourse note it received as partial consideration for its sale of Bank stock to the Texas investors. "The question wheth-er a taxpayer may take a partial bad debt deduction is ... committed to the sound discretion of the Commissioner, and his judgment is controlling unless it is plainly arbitrary or unreasonable." *Wilson Brothers & Co. v. Commissioner*, 124 F.2d 606, 609 (9th Cir.1941). The burden is on the taxpayer to prove the worthlessness of the debt in the year claimed. *Record Wide Distributors v. Commissioner*, 682 F.2d 204, 207 (8th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). Our review of the Tax Court proceeding is limited to determining whether substantial evidence exists to support the court's decision. *Riss v. Commissioner*, 478 F.2d 1160, 1164 (8th Cir.1973). We conclude that there is substantial evidence to support the Tax Court's ruling that the Commissioner did not abuse his discretion in disallowing this deduction.

### IV.

For the reasons stated above, we reverse the judgment of the Tax Court to the extent that it grants Arkansas Best ordinary loss treatment for the losses it incurred on Bank stock purchased after 1972 and on Bank stock purchased from the Bank president in 1972. In all other respects, the judgment of the Tax Court is affirmed.

HANSON, Senior District Judge, dissenting.

I must dissent to section II of the Court's opinion. The majority opinion scorns *Corn Products* and its progeny as fostering uncertainty in taxpayers' motivations in purchasing capital stock, favoring instead a return to the literal meaning of section 1221. The majority therefore falls in line with those critical of all *Corn Products* has wrought.

It appears to me, however, that *Corn Products* was merely an attempt to divine congressional intent. As such, it is a compelling rejoinder to those who believe "that legislative draftsmen and the tax-writing committees of the Congress are the most desirable forum for illuminating a subject matter they themselves made obscure and

interminable." Javaras, Corporate Capital Gains and Losses—The *Corn Products* Doctrine, 52 Taxes 770, 794 (1974).

After it announced in 1971 that it would divest its Bank holdings, Arkansas Best was compelled to infuse capital into the Bank in order to preserve its equity in the Bank. It is therefore apparent that, consistent with *Corn Products,* the stock was purchased as an integral and necessary act in the conduct of Arkansas Best's business as a holding company. *See Booth Newspapers, Inc. v. United States,* 303 F.2d 916, 921 (Ct.Cl.1962).

Nor am I convinced that this Circuit has in the past narrowly construed *Corn Products. Municipal Bond Corp. v. Commissioner,* 341 F.2d 683 (8th Cir.1965), specifically did not narrow *Corn Products,* but rather dealt only with the plain meaning of the unambiguous word "primarily." *Id.* at 688. In addition, *M.F.A. Central Cooperative v. Bookwalter,* 427 F.2d 1341 (8th Cir. 1970), *cert. denied,* 405 U.S. 1045, 92 S.Ct. 1303, 31 L.Ed.2d 588 (1972), cannot support the majority's conclusion that this Circuit follows the plain meaning of section 1221 in all cases. Indeed, the focus in *M.F.A. Cooperative* had to do with stock which at no point could be said to have been worthless; rather, the Court found dispositive the fact that the stock had substantial value. *Id.* at 1343–44. There can be no doubt that in this case purchases after 1972 were at a substantial loss, and were an attempt to avoid liquidation of the Bank and to preserve the insurance license of its subsidiary, Universal.

I therefore would hold that Arkansas Best was entitled to ordinary loss treatment on its purchase of stock after 1972.