**BANK OF KIRKSVILLE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 93–0222–CV–W–9.

United States District Court,
W.D. Missouri,
Western Division.

Oct. 31, 1996.

Keith W. Hicklin, Witt & Hicklin, P.C., Platte City, MO, for plaintiff.

Jay P. Golder, U.S. Department of Justice, Office of Special Litigation, Tax Div., Jaye E. Rooney, U.S. Department of Justice, Tax Division, Washington, DC, for defendant.

*ORDER GRANTING IN PART AND DE-NYING IN PART PLAINTIFF'S RE-QUEST FOR THE RECOVERY OF FEDERAL INCOME TAX AND ES-TABLISHING A PROCEDURE FOR DETERMINING THE AMOUNT OF PLAINTIFF'S RECOVERY*

BARTLETT, Chief Judge.

Plaintiff Bank of Kirksville (the Bank), is located in Kirksville, Missouri. For each of the years 1973 through 1979, 1982, and 1985 through 1988, the Bank of Kirksville timely filed a United States corporation income tax return (Form 1120) with the Internal Revenue Service (IRS). The IRS disallowed a portion of plaintiff's bad debt deductions and required plaintiff to recognize interest that would have accrued on the non-performing loans. Plaintiff paid the corresponding increase in its income tax for the affected years. Plaintiff sought and was denied a refund from the IRS of the additional federal income tax paid. After plaintiff's request for a refund was denied, plaintiff brought suit in this court seeking recovery of the federal income tax and interest paid on the disputed amount of income tax.

A non-jury trial was held from December 19, through December 23, 1994, and from May 22, through May 24, 1995.

I.

## FINDINGS OF FACT

Based on the evidence presented at trial, I make the following Findings of Fact.

Plaintiff Bank of Kirksville is a Missouri banking corporation with its principal office in Kirksville, Missouri. Kirksville is a rural community of approximately 16,000 residents with a primarily agricultural-based economy. Generally, the Bank does business with customers within a 50–mile radius of the Bank.

During the years in issue, loans made to farmers or agricultural-related businesses were 24% of the Bank's loan portfolio.

Also during the time period relevant to this lawsuit, the Board of Directors of the Bank (the Board) included farmers, an accountant, an attorney, the owner of a plumbing supply and Bank officers. The Board members had extensive experience in farming and banking. In most instances, the Board members knew personally or by reputation the citizens and businesses that borrowed money from the Bank. The Board often had personal knowledge about the quality and value of collateral pledged to secure repayment of the Bank's loans.

The Board's Executive Committee reviewed the Bank's problem loans on a weekly basis. The full board reviewed all loans on a monthly basis. At Board meetings, the Bank's loan officers often reported on the status of specific loans, on the financial position of borrowers, and on the value of collateral securing the Bank's loans.

When the Board determined that payments were not being made on a loan that was undersecured, i.e., the value of the collateral was less than the loan balance, and that there was little likelihood that the borrower's financial position would improve, the Bank often charged-off all or a portion of the loan. The charge-offs reduced the Bank's assets by the amount of the charge-off. In addition, the Bank no longer accrued interest on the charged-off portion of the loan and, therefore, its net income was reduced. The Bank's income tax liability decreased as a result of the reduction in the Bank's income.

For the tax years at issue, the Board determined when loans should be charged-off in whole or in part. When making a decision to charge-off a portion or all of a loan, the Board used its personal knowledge of farming and the local and national economies. The Board considered many factors including the borrower's history of payment, the borrower's reputation, the borrower's financial condition, the recommendation of outside professionals and regulatory agencies, and the value of the collateral securing the loan.

In considering the value of its collateral and in determining whether a debt was worthless, the Bank factored in the Bank's costs to liquidate the asset in a forced sale. In effect, the Bank considered what net amount would be available to reduce the balance of the loan. In addition to making a determination of the value of collateral, the Bank considered whether it had a senior lien that would be paid first out of any proceeds obtained through sale of collateral or a junior lien that would only be paid after the senior lien was paid off.

The Bank relied on the Board members' personal experience and expertise as well as information contained in Credit Memorandums in making its charge-off decisions. Credit Memorandums for individual borrowers were prepared by the Bank's loan officers and included such things as appraisals of the collateral, the borrowers' balance sheet, a cash flow analysis and other pertinent information concerning the borrower.

In most instances, by the time the Board made the decision to charge-off all or a portion of a loan, the Bank had worked with the borrower for a two- or three-year period in order to assist the borrower in getting current with principal and interest payments.

In addition to charging-off worthless debts in whole or in part, the Bank stopped accruing interest income on loans deemed nonperforming but which had not yet been charged-off. The Bank determined that a loan was nonperforming when interest and/or principal payments were not being made by the borrower. When loans were put on this "nonaccrual" status, the loans remained part of the Bank's assets on its balance sheet. The Bank's policy was to put its loans on nonaccrual status when the loan was 90 days delinquent and the Bank had no reasonable expectation that it could collect the interest on the loan.

The economy in the Bank of Kirksville's trade area is closely intertwined with the farm economy. During the late 1970's through the early 1980's, the agricultural economy was booming. Commodities, livestock, and land prices increased at a great rate. In the mid–1980's, real estate, livestock and commodities prices fell dramatically. For example, prices for farmland in Northwest Missouri, where the Bank is located, fell by about 55% from 1981 to 1986.

Many farmers had severe cash flow problems after the prices of livestock and commodities fell. Many farmers in the Bank's trade area had financed their expansion during the good times by borrowing from the Bank. When the downturn came, many of these customers could not make their loan payments. Farmers seeking to sell their farmland or machinery to pay off their loans found that there were no buyers for their property.

Because farmers were struggling, many related businesses in the Kirksville area such as machinery dealers, grain elevators, and

rural banks failed or found themselves in severe financial trouble. For instance, by the mid–80's, every farm machinery business in Kirksville had either gone out of business or had been foreclosed by a lender.

During this time, the Farmers Home Administration (FmHA) and the Federal Land Bank (FLB) foreclosed on many farmers in the Kirksville area. The Chairman of the Board of the Bank, Fred Jaynes, worked with the FLB to restructure loans so that the Bank's borrowers were in a better position to repay their loans.

In addition to restructuring their loans, farmers sought government subsidies to help them through the farm crisis. For example, farmers who participated in the Conservation Reserve Program (CRP) received money in exchange for letting their farmland lie fallow. However, the receipt of government subsidies and the restructuring of debt did not provide an adequate safety net for many farmers in the Kirksville area.

The Bank repossessed livestock, machinery, and many acres of farm real estate during the mid–80's as a result of foreclosures and other action taken to realize on problem loans. The Bank typically put the repossessed property on the market immediately after foreclosure. The Bank tried to sell the repossessed collateral quickly so as to create income-producing assets.

From 1985 through 1988, the Bank was examined regularly by the Federal Deposit Insurance Corporation (FDIC) and the Missouri Division of Finance. The regulatory examinations included a review of the Bank's loan portfolio and an analysis of the manner in which the Bank reserved for loan losses.

In reviewing a bank's loan portfolio, regulators classified loans to rate the degree of risk that a bank would have in collecting the loans. Problem loans were classified in several categories: doubtful, substandard, and loss.

A loan or portion of a loan that was classified as substandard was one that has more than normal banking risk associated with it. The loan usually had no security or the security's value was very low in relation to the value of the loan. A bank was required to take corrective action on loans that were classified as substandard.

A loan or portion of a loan that was classified as doubtful was considered to be in trouble. Corrective action that the Bank could take on loans classified as doubtful included: 1) obtaining additional security from the borrower; 2) obtaining additional payments from the borrower; or 3) implementing any other option that would allow the borrower to get current on the principle and interest payments.

When a loan or portion of a loan was classified as a loss, the Bank was required to charge-off the loan or portion of the loan.

The IRS allows banks to deduct the amount of bad debts that regulatory agencies require be charged-off. *See* Treas.Reg. § 1.166–2(d)(2).

The classification of loans by bank regulators, as well as economic factors, influenced the Bank's decisions about which loans to charge-off. Once farmland, commodity and livestock prices began falling in the 1980's, banking examiners required banks to determine the true value of collateral so that depositors could adequately assess the Bank's financial position. Bank examiners encouraged the Bank to quickly recognize and charge-off any losses.

Earl Manning, Commissioner of Finance for the State of Missouri, testified that a bank's management tends to value collateral too high to avoid loan classification and the resulting charge-offs because of the negative implications for a bank's balance sheet and its capital structure.

[T]o the extent any asset is classified loss, it must immediately be removed from the bank, the carrying value of the assets. That means the level of assets on the asset side of the ledger goes down, and you have to adjust the liability side by an equal amount of money. And the only place to adjust the liability side is in the capital account. So if you have an asset that must be reduced in value or charged-off all together, it not only reduces the assets of the bank, it reduces the capital of the bank. There is only so much capital in a bank. If you have enough of those losses,

you can entirely deplete the capital structure of the bank.

Transcript of trial on December 19, 1994, at 108–09.

In a Report of Examination of the Bank dated November 25, 1983, examiners from the Missouri Division of Finance stated:

> Classified loans are up from the previous examinations; however, this level is still considered acceptable. This increase is a continuation of an adverse trend dating back to the 1980 examination. Although most of the classifications are in the less severe category of Substandard, *management should continue to work at keeping this adverse trend from continuing.*

Report of Examination at Plaintiff's Exh. 33 (emphasis added).

This statement was intended to encourage the Board to address its poorly performing loans and to recognize its losses by charging-off worthless loans.

In a Report of Examination of the Bank dated January 28, 1985, examiners from the Missouri Division of Finance stated:

> Asset quality has shown significant deterioration since the last examination. Adverse weather conditions and the generally poor farm economy have been the major factors contributing to the large volume of classifications ... It is apparent that the majority of the losses shown in this report of examination should have been charged-off in 1984. The Board is reminded to promptly recognize loan losses and stop accruing interest on loans past due ninety days or more, unless they are well secured and in the process of collection. ·

January 28, 1995, Report of Examination dated January 28, 1985; Plaintiff's Exh. 34.

By 1985, the Board recognized that many loans in its portfolio were not going to be repaid. The Bank engaged Hardin, Cummins, Moss & Miller (Hardin), Certified Public Accountants, to perform an examination of the Bank's loan portfolio to assist the Bank in applying a loan grading system to the Bank's loans, and to assess the extent of the problems in the Bank's loan portfolio. On November 27, 1985, Hardin issued its report (the Hardin Report) to the Bank. *See* the Hardin Report, Plaintiff's Exh. 14. In its report, Hardin established seven levels for grading the Bank's loans. The grades ranged from Level 1, a loan with minimum credit risk, to Level 7, loans where the full collection of principal was doubtful. The Board considered the information in the Hardin Report in making its charge-off decisions.

For tax years 1985 through 1988, the Bank claimed deductions for additions to its bad debt reserves pursuant to 26 U.S.C. §§ 166 and 585 of the Internal Revenue Code (the Code). Specifically, the Bank took deductions for additions to the Bank's bad debt reserve in the amount of $811,127 in 1985; $2,707,863 in 1986; $233,075 in 1987; and $821,296 in 1988. In part due to its deductions for bad debts, the Bank reported a loss on its federal income tax return for the tax years 1985 and 1986. The Bank carried back to the 1976, 1977, 1978, and 1979 tax years as a Net Operating Loss its losses from 1985 to 1986.

On March 24, 1992, after an audit of the Bank's income tax returns by IRS agent Susan Stockton, the IRS District Director, Kansas City, Missouri, sent a report to the Bank proposing that plaintiff review its federal income tax for the taxable years 1973 through 1979, 1982, and 1985 through 1988 based on the findings in the audit. The IRS proposed that the Bank make adjustments to the following items in its income tax returns: 1) bad debt deductions for the 1985 through 1988 tax years; 2) Net Operating Loss (NOL) for years 1975 through 1979; and 3) accrued interest income for the 1987 through 1988 tax years.

On August 21, 1992, the District Director sent a corrected report containing minor changes from the original report. In the corrected report, the IRS proposed specific adjustments to bad debt deductions and accrued interest income with respect to individual borrowers for taxable years 1985 through 1988.

On September 10, 1992, plaintiff signed a Waiver of Restrictions on Assessment and Collection of Deficiency and Tax and Acceptance of Over Assessment (the Waiver) for all the tax years in questions. By executing

and filing the Waiver, plaintiff consented to the immediate assessment and collection of the tax deficiencies proposed in the corrected report.

On September 11, 1992, plaintiff paid the IRS $1,567,830.74 ($868,054 in additional tax and $699,776.74 in interest) for the 12 years at issue.

On December 10, 1992, plaintiff filed a Form 1120–X with the Internal Revenue Service Center at Kansas City, Missouri, requesting a refund of the federal income taxes and interest paid for each of the twelve tax years in question. The IRS disallowed plaintiff's Form 1120–X Tax Refund Claims on January 20, 1992.

Plaintiff brought this suit on March 8, 1993.

The bad debt deductions at issue were taken on loans to 32 individuals and businesses. Most of the loans were made to farmers or farm suppliers whose financial stability was tied closely to the farm economy. The loans to borrowers 001[1] through 032 were "non-performing" when charged-off because the borrower was delinquent in the payment of principal or interest or both. In each case the borrower could not pay the Bank from monies obtained through normal business operations. The borrowers did not have other property to pledge as additional security or other funds with which to pay the Bank. In four instances, the borrower running the business or farm operation had died or was terminally ill. In each charge-off situation at issue, the primary source of repayment of the defaulted loans would have been the liquidation of the borrower's collateral.

During the trial plaintiff agreed with defendant's position that the amounts charged-off for the following borrowers were overly aggressive:

| | |
|---|---|
| 002 | $36,000 |
| 010 | $53,434 |
| 014 | $25,000 |
| 017 | $25,000 |
| 023 | $5,608 and $19,392 |
| 030 | $16,700 and $8,300 |
| 032 | $54,000 and $28,000 |

Defendant agreed with the plaintiff's position that the amounts charged-off for the following borrowers were proper: 003 $29,-000 should have been allowed in 1986 rather than 1988; and 021 $13,000 and $25,000.

For each of the charged-off loans at issue, Dr. Kevin C. Moore gave expert testimony on behalf of the IRS concerning the value of the collateral securing the loans and the appropriateness of the charge-offs. Moore is an Assistant Professor of Economics and an Extension/State Farm Management Specialist. Dr. Moore's testimony was based on his personal and professional knowledge and several data bases and surveys that established farm prices on an area-wide or county-by-county basis.

IRS Agent Susan Stockard, who performed the audit of the Bank's income tax returns, testified on behalf of the IRS about the method for determining collateral values in disallowing the charge-offs at issue. During the audit, Stockard reviewed the loan files of all the loans at issue. Stockard determined collateral values from appraisals and the borrowers' balance sheets that were in the loan files. Because the information in the loan files was often over six months old, sole reliance on the loan file did not support credible determinations of fair market value because of the rapid and severe decrease in the value of farmland and collateral during the relevant period.

E.L. Burch gave expert testimony on behalf of the Bank concerning the value of the collateral securing the charged-off loans and the appropriateness of the charge-off decision. Burch provides consulting services to banks. Burch has consulted with 200 banks throughout the Midwest on general banking issues, acquisitions and mergers. In addition, Burch consulted with banks when questions were raised by bank examiners about the quality of loan portfolios.

Burch has served on the Conference of State Bank Supervisors for the State of Missouri. In that capacity, Burch advised the Missouri Commissioner for the Division of Finance on banking issues.

---

**1.** To maintain the privacy of the borrowers whose loans are at issue in this lawsuit, each borrower was assigned a number from 001 through 032.

In addition, Burch has owned or had substantial interest in several Missouri banks. Also, he has served as a director of several banks. Burch owned a rural bank in Northeastern Missouri, 30 miles from Kirksville, during the years at issue. Not only has Burch had substantial first hand experience with deciding whether loans are worthless and should be charged-off, but he had actual experience with valuing collateral in the Kirksville area at the time involved in this case.

Douglas Kollar, a director of the Bank and a Certified Public Accountant in Kirksville with many farmers as clients, testified on behalf of the Bank about general economic conditions in the Kirksville area during the relevant time period, about the Bank's policies for charging off loans and about specific charge-off decisions. He also testified about the Bank's policy of placing loans on nonaccrual status.

Based on Burch and Kollar's personal experience with farming, rural banking, valuing collateral and farmland in northeast Missouri during the period at issue, I found Burch and Kollar to be straightforward, informed and more knowledgeable than Moore about conditions in the Bank's trading area that effected value of collateral during the relevant period. Burch and Kollar's estimates of fair market value were generally sound and were realistically grounded in the real world faced by the Bank at the time the Bank made the charge-off decisions.

On the other hand, the United States' witnesses did not have the practical, real life experience in banking in that area of Missouri that made the Bank's witnesses so persuasive. The United States' witnesses relied heavily on published reports of general economic conditions at the time and on documents in the Bank's file. These sources of information certainly were not irrelevant but they were frequently inadequate to support persuasively the conclusions the United States' witnesses sought to draw.

The United States objected to percentages that Burch and Kollar used to determine what the Bank could have expected to realize from collateral at the time in question. I am persuaded that the percentages used were reasonably grounded in the actual economic conditions at the time in the Kirksville area and produced a more reliable estimate of the fair market value of the collateral, i.e., what the Bank could have reasonably expected to receive for the collateral under all the circumstances then existing, than the approach used by either Moore or Stockard.

## II.

### CONCLUSIONS OF LAW

Under 26 U.S.C. § 166(a), a taxpayer may deduct from income any debt that the taxpayer can establish became wholly worthless during the tax year. *See Edison Homes, Inc. v. Commissioner,* 903 F.2d 579, 582 (8th Cir.1990). The deduction of bad debts under § 166(a) is called the "specific charge-off method."

An alternative to the "specific charge-off method" is the "bad debt reserve method" set forth in § 166(c). Before the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2361 (1986), § 166(c) provided that "[i]n lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts." Section 166(c) allowed a taxpayer to take a deduction for a reasonable addition to a reserve established to cover future bad debts.

After 1986, most taxpayers could not use the reserve method. However, certain financial institutions, such as the Bank, were authorized to continue to use the reserve method. Title 26 U.S.C. § 585 states that a "bank shall be allowed a deduction for a reasonable addition to a reserve for bad debts ... in lieu of any deduction under § 166(a)."

The formula for determining the amount of a reasonable addition to the bad debt reserve is contained in Treasury Regulation § 1.585–2(c)(1) and is identical to the formula set forth by the Tax Court in *Black Motor Co. v. Commissioner,* 41 B.T.A. 300 (1940), *aff'd on other grounds,* 125 F.2d 977 (6th Cir.1942). The amount of bad debts charged-off in a tax year is used in the *Black Motor Co.* formula, and therefore, affects the calculation for the addition to the bad debt reserve.

■ A taxpayer claiming a bad debt deduction must first establish the existence of a bona fide debt in the amount which he seeks to deduct. *Davis v. Commissioner*, 866 F.2d 852, 859 (6th Cir.1989). Next, the taxpayer must show worthlessness of the debt for which a deduction is claimed. *Cole v. Commissioner*, 871 F.2d 64, 67 (7th Cir.1989). A debt is worthless if a reasonable person in the exercise of sound business judgment would regard collection as hopeless. *Riss v. Commissioner*, 478 F.2d 1160, 1162 (8th Cir. 1973). This is a factual determination that depends upon all the surrounding circumstances and takes into account all pertinent evidence. Treas.Reg. § 1.166–2(a); *Boehm v. Commissioner*, 326 U.S. 287, 292, 66 S.Ct. 120, 123–24, 90 L.Ed. 78 (1945).

■ Under § 166(a)(2), a deduction may be taken for a partially worthless debt. "[W]hen satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged-off within the taxable year as a deduction." The Commissioner is vested with broad discretion not to allow a deduction for a partially worthless debt. *Arkansas Best Corp. v. Commissioner*, 800 F.2d 215, 221 (8th Cir.1986), *aff'd*, 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). As long as the Commissioner's judgment is not plainly arbitrary or unreasonable, it may not be disturbed. *Brimberry v. Commissioner*, 588 F.2d 975, 977 (5th Cir.1979).

■ A statutory grant of discretion to the Commissioner limits a judicial review of the Commissioner's determination. The Commissioner's determination can be found unreasonable only if the taxpayer proves an abuse of discretion. *Edison Homes, Inc.*, 903 F.2d at 582. The focus is not solely on the reasonableness of the taxpayer's calculations. "That is, that the taxpayer's calculations are reasonable does not necessarily mean that the Commissioner's are unreasonable." *Id.* at 583. However, if the taxpayer can show that the charge-off decision was a sound business judgment supported by all of the facts reasonably available, the Commissioner's position is arbitrary and unreasonable. *Production Steel, Inc. v. Commission-

er*, 39 T.C.M. (CCH) 77, 1979 WL 3659 (1979).

■ During the 1985, 1986, 1987, and 1988 tax years, plaintiff was entitled to deduct from its taxable income those debts which became worthless during each of those years. The Commissioner determined that certain charge-offs did not qualify as current bad debts during the 1985–88 tax years. Therefore, these charge-offs were not properly included in the Bank's calculations for its bad debt reserve using the equation contained in Treas.Reg. § 1.585–2(c)(1) and in the *Black Motor Co.* formula.

In determining that the charge-offs were not valid under the Code, the IRS objected to the Bank's use of fair market values for collateral that included a consideration of the Bank's cost of liquidating the asset.

However, "all pertinent evidence, including the value of the collateral, if any, securing the debt ..." should be considered in determining whether a debt is worthless. Treas. Reg. § 1.166–2. The "value of the collateral" as used in §§ 166 and 585 and the accompanying Treasury Regulations is its fair market value at the time the loan is charged-off as determined by all of the circumstances reasonably taken into account for the determination of fair market value. In making the determination of fair market value of collateral securing a loan by a bank, the bank may take into account all reasonable factors effecting the amount of money the bank could expect to receive if the collateral were liquidated, including a reasonable estimate of the cost of disposing of the property. Therefore, the Bank appropriately valued collateral taking into consideration the net proceeds that could be obtained after a forced sale in a depressed market.

■ The IRS also objected to the Bank's consideration of whether the loan had been classified by bank examiners in deciding which loans to charge-off. Pursuant to Treas.Reg. § 1.166–2(d)(2), unless federal or state bank regulators require a bank to charge off a loan, there is no conclusive presumption of worthlessness under § 166. Classification of collateral as "doubtful" or "substandard" by either the FDIC or state bank regulators does not establish worthless-

ness under § 166. However, classification of a loan as "doubtful" or "substandard" as well as the general comments of bank regulators reflecting economic conditions at the time a loan is classified is "pertinent evidence" for the purposes of determining worthlessness pursuant to Treas.Reg. § 1.166–2.

Therefore, whether a loan was classified and the level of classification were pertinent to a determination of whether a loan was worthless in whole or in part.

The Bank properly considered all the surrounding facts and circumstances in determining the fair market value of its collateral. The Bank's charge-off decisions were made during an agricultural economic crisis in the farm economy in the Kirksville area effecting both farmers and farm-related businesses. The Bank concluded properly that its ability to collect most of the loans at issue was jeopardized as many farmers' cash flows dried up and the value of their collateral plummeted.

Based on the persuasive evidence presented by the Bank, specifically, the testimony of Burch and Kollar, the Bank exercised reasonable and sound business judgment in determining that the following amounts charged-off for these borrowers were worthless:

| | |
|---|---|
| 001 | $150,000 and $125,000 |
| 004 | $55,000 |
| 005 | $30,000 and $45,033 |
| 006 | $80,000 |
| 007 | $83,064, $17,046, $3,496 and $28,889 |
| 008 | $20,000 and $5,486 |
| 009 | $20,000 and $46,000 |
| 011 | $25,000 |
| 012 | $26,556 |
| 013 | $20,000 |
| 015 | $25,000 |
| 016 | $35,000 |
| 018 | $6,000 |
| 019 | $20,000 |
| 020 | $50,000 and $17,500 |
| 022 | $150,000, $53,001 and $50,000 |
| 024 | $95,000, $61,897 and $60,647 |
| 025 | $35,000 |
| 026 | $86,300 |
| 027 | $150,000 and $97,737 |
| 028 | $25,000 |
| 029 | $20,000 and $4,000 |
| 031 | $25,000 |

A reasonable person with the information the Bank had about these loans and exercising sound business judgment would have determined that these loans and portions of loans were worthless. Under the circumstances, the Commissioner abused his discretion in denying the bad debt deductions claimed by the Bank for these loans. *See Production Steel, Inc.*, 39 T.C.M. (CCH) at 77.

However, with regard to the following loans or portions of loans that the Bank claimed were worthless, the Bank did not persuasively demonstrate that the Commissioner abused his discretion in determining that these loans were not worthless in the tax year in which the Bank claimed bad debt deductions:

| | |
|---|---|
| 007 | $21,111 |
| 012 | $1,444 |
| 013 | $2,271 and $15,661 |
| 018 | $9,000 and $19,221 |
| 020 | $25,000 |
| 024 | $13,103 and $35,898 |
| 025 | $47,333 |
| 026 | $13,200 |
| 027 | $32,738 |

In Appendix A, I have summarized my conclusions pertaining to each of the disputed charge-offs.

The Bank also objects to the IRS's requirement that it include in income the accrued interest for loans placed on nonaccrual status for the tax years 1987 and 1988. Because plaintiff is an accrual method taxpayer, it is required to include in its income the interest earned on loans during the tax year even if the interest was not collected. *See* 26 U.S.C. §§ 61 and 451(a). The Bank was not required to accrue interest income on loans or portions of loans that were properly charged-off. *See* 26 U.S.C. § 451(a); *In re Chicago and Northwestern Railway Co. v. C.I.R.*, 29 T.C. 989, 1958 WL 1137 (1958). Therefore, the Bank was not required to accrue interest after the date of the charge-off on the loans or portions of loans that were worthless.

■ The standard for not including interest in income is different than the standard for charging-off worthless debts. Accrual of income is not required when there is no reasonable expectancy that the loan will ever be paid. *European American Bank and*

*Trust Co. v. United States,* 20 Cl.Ct. 594, 605 (1990), *aff'd,* 940 · F.2d 677 (Fed.Cir.1991).

█ The Bank had a specific policy for putting loans on "nonaccrual" status. Interest was no longer accrued on loans that were delinquent for .at least 90 days and when the Bank determined it was unlikely that the debt would ever be paid because of the financial instability of the borrower. Because the Bank had no reasonable expectancy of payment on the loans put on nonaccrual status in 1987–89, the Bank appropriately put those loans on nonaccrual status.

### III.

### ORDER

For the reasons stated, it is ORDERED that:

·1) plaintiff's request for a refund of federal income tax is granted in part and denied in part;

2) the Commissioner abused his discretion in denying bad debt deductions for borrowers 001, 004, 005, 006, 007, 008, 009, 011, 012, 013, 015, 016, 018, 019, 020, 022, 024, 025, 026, 027, 028, 029, and 031 as shown in Appendix A attached to this opinion;

' 3) the Commissioner did not abuse his discretion in denying plaintiff's bad debt deductions for borrowers 007, 012, 013, 018, 020, 024, 025, 026 and 027;

4) plaintiff was not required to accrue income on the loans or the portions of loans that it properly charged-off in tax years 1985 through 1988 and for the loans that were put on non-accrual status in tax years 1987 and 1988;

5) within 30 days from the date of this order, plaintiff shall file with the Clerk of the Court and serve upon defendant a computation of the specific amount of tax refund (including interest) that it believes it is entitled to under the Findings of Fact and Conclusions in this opinion;

6) within 20 days after service of the plaintiff's computation, defendant may file with the Clerk of the Court and serve upon plaintiff its specific objections to the computation;

7) within 20 days after the defendant files its objections, counsel shall meet in person or by telephone and attempt to resolve defendant's objections. If ·agreement cannot be reached on the appropriate amount of plaintiff's refund under this opinion, a telephone conference with me should be arranged through the courtroom deputy clerk, Tina Duer (816–426–3810);

8) if defendant does not file any objections to plaintiff's computation, a final judgment will be entered in this case in the amount set forth in plaintiff's computation;

9) if plaintiff believes it is entitled to reimbursement for some or all of its attorney's fees and expenses, plaintiff shall file,, at the same time that plaintiff files its computation pursuant to ¶ 5) of this order, a statement setting forth the amount of attorney's fees and expenses claimed and the manner in which the attorney's fees and expenses are computed; and

10) if defendant objects to the claimed attorney's fees and expenses, defendant shall file its specific objections by the deadline provided in ¶ 6).

### APPENDIX A

| Borrower | Loan Balance Before Disputed Charge–Off | Description of Collateral | Fair Market Value of Collateral at Time of Charge–Off | Amount of Charge–Offs in Dispute | Disputed Charge–Off That Should Have Been Allowed |
|---|---|---|---|---|---|
| 001 | | acc'ts. rec., | | 11/88 | |
| | $439,009 | notes rec., | $217,978 | $150,000 | $150,000 |
| | | machinery, | | 12/88 | |
| | $389,009 | real estate | | $125,000 | $125,000 |

| Bor-rower | Loan Balance Before Disputed Charge–Off | Description of Collateral | Fair Market Value of Collateral at Time of Charge–Off | Amount of Charge–Offs in Dispute | Disputed Charge–Off That Should Have Been Allowed |
|---|---|---|---|---|---|
| 004 | $104,542 | machinery, livestock, stored grain, growing crops | $49,594 | 12/86 $55,000 | $55,000 |
| 005 | $75,033 2d DOT on | livestock, machinery, father's farm | $36,450 | 6/86 $30,000 12/86 $45,033 | $30,000 $45,033 |
| 006 | $472,000 | 2d DOT on 898 acres | $300,000 | 12/86 $80,000 | $80,000 |
| 007 | $243,745 | inventory, equipment, 2nd DOT on borrower's house and 2nd DOT on commercial property | $111,250 | 6/85 $83,064 6/85 $17,046 12/85 $3,496 12/85 $50,000 | $83,064 $17,046 $3,496 $28,889 |
| 008 | $50,951 | livestock | $24,000 | 6/86 $20,000 12/88 $5,486 | $20,000 $5,486 |
| 009 | $120,000 * $12,469 * | real estate, growing crops, CRP proceeds | $66,000 | 7/86 $20,000 12/86 $46,000 | $20,000 $46,000 |
| 011 | $177,311 | real estate, inventory | $126,721 | 12/86 $25,000 | $25,000 |
| 012 | $29,556 | livestock, machinery, trailer | $3,000 | 12/87 $28,000 | $26,556 |
| 013 | $42,729 $22,729 | livestock, machinery, vehicle, | $22,270 | 6/85 $20,000 12/86 $2,271 6/88 $15,661 | $20,000(1) $0 $0 |
| 015 | $46,000 | junior lien on real estate, machinery, livestock, 3 vehicles | $21,940 | 12/86 $25,000 | $25,000 |
| 016 | $65,862 | ⅙ interest in father's estate | $0 | 12/86 $35,000 | $35,000 |

| Borrower | Loan Balance Before Disputed Charge-Off | Description of Collateral | Fair Market Value of Collateral at Time of Charge-Off | Amount of Charge-Offs in Dispute | Disputed Charge-Off That Should Have Been Allowed |
|---|---|---|---|---|---|
| 018 | $37,622 | stock in debtor's corp., junior lien on real estate | $31,750 | 7/86 $15,000 8/87 $19,221 | $6,000 $0 |
| 019 | $90,993 | livestock 1st DOT on 120 acres; ⅙ interest in father's estate | $52,500 | 12/86 $20,000 | $20,000 |
| 020 | $134,191 | 2nd DOT on 320 acres; livestock; equipment; crops | $66,286 | 7/86 $50,000 12/86 $20,000 | $50,000 $17,500 |
| 022 | $645,000 | real estate machinery growing crops; | $60,000 | 12/86 $150,000 6/88 $53,001 11/88 $50,000 | $150,000 $53,001 $50,000 |
| 024 | $289,897 | real estate | $177,875 | 12/85 $95,000 | $95,000 |
| | $194,897 | | $133,000 | 7/86 $75,000 | $61,897 |
| | $119,897 | | $59,250 | 12/87 $96,545 | $60,647 |
| 025 | $82,343 | stock in Green Hills Aviation & Piper air- plane; insur- ance proceeds | $47,000(3) | 12/87 $35,000 | $35,000 |
| | $47,343 | | | 9/88 $47,333 | $0 |
| 026 | $249,918 | machinery equipment livestock crops real estate | $127,475 | 12/86 $99,500 | $86,300 |
| 027 | $405,812 | equipment livestock | $165,462 | 12/85 $150,000 | $150,000 |
| | $255,812– (2) | real estate | $127,460 | 12/86 $32,738 $97,737 | $0 $97,737 |

| Bor-rower | Loan Balance Before Disputed Charge-Off | Description of Collateral | Fair Market Value of Collateral at Time of Charge-Off | Amount of Charge-Offs in Dispute | Disputed Charge-Off That Should Have Been Allowed |
|---|---|---|---|---|---|
| 028 | $188,193 * | 2nd DOT on 120 acres; 3rd DOT on 480 acres | $60,750 | 12/86 $25,000 | $25,000 |
| 029 | $33,321 | 2nd DOT on borrower's home | $1,000(4) | 7/86 $20,000 9/86 $4,000 | $20,000 $4,000 |
| 031 | $27,515 | 3 automobiles | $2,500 | 12/86 $25,000 | $25,000 |

KEY => DOT = Deed of Trust.
CRP = Conservation Reservation Program.
\* = Borrower had more than one loan with the Bank.
(1) = IRS allowed in 1986 and should have allowed in 1985.
(2) = $140,018 of this amount guaranteed by FAA.
(3) = Reasonable expectation at the time of recovery on insurance.
(4) = Fair market value of house $21,000, less $20,000 First Mortgage.